[Cite as *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536.]


STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

THE STATE OF OHIO,      )
                                )     CASE NO. 08 MA 57
        APPELLEE,       )
                                )
        v.                  )     OPINION
                                )
KAUFMAN,           )
                                )
        APPELLANT.     )

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Common Pleas Court, Case No. 07 CR 1369.


JUDGMENT:                          Reversed and Remanded.


APPEARANCES:

Paul J. Gains, Mahoning County Prosecuting Attorney, and Ralph M. Rivera, Assistant Prosecuting Attorney, for appellee.

Lynn Maro, for appellant.


JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Gene Donofrio


                                          Dated: March 31, 2010


DeGenaro, Judge.

{¶ 1}   This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Appellant, Michael Kaufman, appeals the March 25, 2008 decision of the Mahoning County Court of Common Pleas that sentenced him to five consecutive life sentences and four consecutive five-year sentences, subsequent to a jury finding him guilty of four counts of rape, four counts of gross sexual imposition, and one count of felonious sexual penetration.

{¶ 2}   Kaufman argues on appeal that his convictions were against the manifest weight of the evidence and that the force specifications for his rape convictions were based on insufficient evidence. Kaufman also contends that the trial court provided improper jury instructions, erroneously allowed irrelevant expert testimony, improperly provided assistance to the state, and limited Kaufman's right to cross-examine a witness. Kaufman further contends that the trial court abused its discretion by denying his motion to continue, that he received ineffective assistance of counsel at trial, and that the state committed prosecutorial misconduct. Finally, Kaufman argues that the trial court erroneously allowed the improper joinder of victims and offenses.

{¶ 3}   The force specifications for Kaufman's rape convictions were based on sufficient evidence under *State v. Eskridge* (1988), 33 Ohio St.3d 56, 526 N.E.2d 304. Although the evidence supporting Kaufman's convictions was not terribly strong given the weakened credibility of one of the victims, his convictions were not against the manifest weight of the evidence. The trial court's decisions regarding jury instructions, admission of expert testimony, and limitation of cross-examination were proper. Kaufman did not demonstrate that the state's objectionable statements deprived him of his right to a fair trial. Finally, the trial court's decision not to sever the charges against Kaufman for the two separate victims was an abuse of discretion, where the testimony

of each victim would not have been admissible in separate trials under Evid.R. 404(B), and the offenses committed against each victim were too similar and inflammatory to realistically avoid fostering the erroneous belief that the distinct offenses corroborated one another. Kaufman's remaining assignments of error regarding assistance to the state, denial of motions to continue ,and ineffective assistance of counsel are moot.

{¶ 4} Accordingly, the trial court's decision will be reversed and remanded for new trials.

### Facts and Procedural History

{¶ 5} On November 1, 2007, a grand jury indicted Kaufman on eight counts of rape, in violation of R.C. 2907.02(A)(1)(b); five counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4); and one count of felonious sexual penetration, in violation of R.C. 2907.12(A)(1)(b). The counts encompassed offenses against three different victims, JB, DC, and KC. JB was born on October 4, 1987, DC was born on April 22, 1991, and KC was born on December 21, 1992, and all victims were minors under the age of 13 at the time of the indicted offenses.

{¶ 6} Kaufman was charged with committing offenses against the three victims as follows: For offenses against victim JB between October 4, 1995, and October 3, 1998, Kaufman was charged with three of the counts of rape, three counts of gross sexual imposition, and one count of felonious sexual penetration. For offenses against victim DC between January 1, 2002, and September 7, 2002, Kaufman was charged with one count of rape and one count of gross sexual imposition. For offenses against victim KC between January 1, 2001, and August 31, 2003, Kaufman was charged with the remaining four counts of rape and one count of gross sexual imposition.

{¶ 7} On November 7, 2007, Kaufman entered a plea of not guilty, and the trial court appointed John B. Juhasz as counsel after finding Kaufman to be indigent. The

trial court scheduled the trial for December 17, 2007. On December 6, 2007, Kaufman filed a motion to continue, noting that counsel had sustained a back injury on November 13, 2007, and that counsel for the state had failed to complete its responses to discovery requests. The trial court granted Kaufman's motion and the trial was rescheduled to take place on January 7, 2008. On December 20, 2007, Kaufman filed another motion to continue due to a conflict with another trial. The trial court rescheduled the trial to January 22, 2008. On January 9, 2008, the parties filed a joint motion for continuance due to scheduling conflicts, which the trial court overruled. On January 16, 2008, Kaufman filed another motion to continue, stating that counsel's back injury, untimely discovery responses from the state, and investigation difficulties rendered counsel unable to provide effective assistance of counsel at such a close trial date. During a January 18, 2008 hearing on Kaufman's motion, the trial court asked defense counsel to pick a continuance date well in the future in order to ensure that such time constraints would not cause any further problems with this trial. The trial court granted Kaufman's motion and continued the trial to March 17, 2008.

{¶ 8} On February 19, 2008, the state filed a supplemental disclosure of evidence regarding a fourth victim, RT, not included in the indictment. On March 3, 2008, Kaufman filed a motion for relief from prejudicial joinder, asking for three separate trials for the three separate victims. Kaufman also filed another motion to continue the trial. The trial court overruled the motion to continue and set a hearing for the motion for relief from prejudicial joinder. Additionally, Kaufman filed a motion to dismiss charges 7, 8, and 11 for lack of jurisdiction, because the offenses were alleged to have occurred outside of Mahoning County. The state filed a motion to introduce evidence of other acts, requesting that the trial court allow testimony from RT, the victim not included in the indictment.

{¶ 9} Subsequent to a hearing on March 11, 2008, the trial court denied Kaufman's request to sever trials and denied the state's motion to admit other acts evidence regarding the fourth victim. The trial court sustained Kaufman's motion to dismiss three of the charges, which left 11 charges against two victims remaining on the indictment. Kaufman repeated his request for severance throughout his trial, but each request was overruled.

{¶ 10} On March 12, 2008, the state filed a motion in limine, asking the trial court to allow KC to testify about acts that had occurred outside the trial court's jurisdiction. On March 13, 2008, Kaufman filed a supplemental motion to continue, repeating his request for an enlarged amount of time to prepare. The trial court overruled both motions.

{¶ 11} On March 17, 2008, the state filed a second motion in limine, asking the trial court to disallow any reference to a 1993 report by JB's mother of suspected sexual abuse of JB by an unspecified person and a 2000 report that JB had molested his little brother, RT, which the trial court sustained. The state filed a third motion in limine, asking to admit the testimony of DC (the third victim in the dismissed counts) as other-acts evidence and asking that KC be permitted to testify about acts not included in the indictment for the purpose of explaining the background behind the offenses actually charged. The trial court disallowed the other-acts evidence of DC, but sustained the state's motion regarding KC.

{¶ 12} During the course of the proceedings, the trial court dismissed Counts 1 and 13, due to errors in the indictment. Pursuant to Kaufman's motion, the indictment was amended to renumber the remaining nine counts. The counts remaining were as follows: For offenses against victim JB between October 4, 1995, and October 3, 1998, Kaufman was charged with two of the counts of rape, three counts of gross

sexual imposition, and one count of felonious sexual penetration (Counts 1 through 5 and 9); and for offenses against victim KC between January 1, 2002, and August 31, 2003, Kaufman was charged with two counts of rape and one count of gross sexual imposition (Counts 6 through 8). During proceedings, the state successfully moved the trial court to provide an *Eskridge* definition of force in the jury instructions and to include the additional finding of force or threat of force for each of the rape and felonious-sexual-penetration charges. See *Eskridge,* 38 Ohio St.3d at 58.

**{¶ 13}** At trial, the state presented the testimony of KC, Karen, JB, Officer Suzanne Doni-Ellis, and Dr. Paul McPherson. Kaufman presented his own testimony and the testimony of Officer Doug Flara, Donna, and Tracey. An initial explanation of the parties' relationships with each other will clarify the parties' testimony.

**{¶ 14}** Tracey was married to Frederick from approximately 1987 to 1991. The couple had a son, JB, on October 4, 1987. Tracey was married to Reginald from approximately 1995 to 1999, though they gave birth to a son, RT, in 1994. Reginald worked at Long Bar Trucking ("LBT"). Kaufman also worked at LBT, starting in 1991. Tracey and Kaufman were married in 2001 and had a son in 2005. Kaufman's mother, Donna, lives in Boardman. Donna's sister, Karen, lives in Wisconsin, but visited Donna in Boardman during most summers. On past visits to Donna, Karen would bring her grandchildren and step-grandchildren along, one of whom is KC, born December 21, 1992.

**{¶ 15}** KC testified that he met Kaufman when Kaufman was visiting family in Wisconsin in 2002 and that he saw Kaufman three other times during KC's short visits to Donna's house in Ohio during the summers of 2002 to 2004.

**{¶ 16}** KC testified that he and other family members met up with Kaufman in the early summer of 2002 and stayed in a motel together, with the males staying in one

room and the females in another room. KC testified that as he was getting out of Kaufman's car in a parking lot of the motel, he scratched the car next to him with the door of Kaufman's car. KC stated that Kaufman "said that he would call the sheriff and tell them that I scratched the car next to me, or I could receive punishment." During that night at the motel, Kaufman woke KC and "said it was time for the punishment," by which he meant performing oral sex on Kaufman. KC also stated that he did not tell anyone what happened at that time because he was scared that Kaufman "might do something" or get KC in trouble for scratching the car.

{¶ 17} During the summer of 2002 and 2003, when KC was in Ohio visiting extended family at Donna's house, Kaufman would get KC alone and continue the "punishment," which involved striking KC's testicles, digitally penetrating KC's anus, or performing fellatio on one another. There were eight or nine people, along with two large dogs, staying in Donna's house during KC's family visits. KC testified that Kaufman got KC alone in the attic, the basement, or the second floor bathroom in order to commit the abuse. On cross-examination, KC stated that he did not remember Kaufman locking any doors when they were in the basement or the attic, but he remembered Kaufman locking the second-story bathroom door.

{¶ 18} KC testified to three or more incidents of Kaufman striking his testicles, two instances of digital-anal penetration, two instances of Kaufman performing fellatio on KC, and one instance of KC performing fellatio on Kaufman in 2002. KC also testified that Kaufman once used a hand-held video recorder to tape KC in the garage while Kaufman was touching KC's penis. KC testified to two instances of Kaufman striking his testicles, one instance of digital-anal penetration, and two instances of fellatio in 2003.

{¶ 19} KC testified that at first, he did not tell anyone about what Kaufman did

during the summer incidents because KC was scared and did not want to get in trouble. Shortly before the family's summer 2004 visit, KC told his step-siblings about the abuse.

{¶ 20} KC testified that during the summer 2004 visit, Kaufman asked KC if he had told anyone about their sexual interactions and that Kaufman "seemed kind of angry." KC denied telling anyone because he was afraid of what Kaufman would do. KC and his step-brother, JT, took a tape recorder from Karen and Donna and used it to try to catch an instance of Kaufman's abuse, but the adults repeatedly found the recorder and took it back. JT told Karen about the abuse during this visit, and Karen took the grandchildren back to Wisconsin.

{¶ 21} On cross-examination, KC testified that Kaufman did not threaten to hurt him. KC testified that Karen was the adult in charge of him during the summer trips to Donna's house, not Kaufman, and that KC called Kaufman "Uncle Mikey." However, KC also testified that Kaufman was an authority figure in Donna's house.

{¶ 22} KC testified that Kaufman had been driving a red Firebird during his 2002 trip to Wisconsin. When asked about the purpose of Kaufman's Wisconsin visit, which was to pick up furniture from Kaufman's recently deceased grandmother, KC agreed that Kaufman would not be able to move a lot of furniture in a Firebird. KC stated that he did not remember what car Kaufman was driving when KC scratched the car door in the parking lot of the motel. KC did not remember Tracey's presence during the 2002 Wisconsin trip.

{¶ 23} When KC was interviewed by social workers in Wisconsin after the 2004 disclosure, he did not tell them about the video-taping incident in the garage of Donna's house.

{¶ 24} Karen testified that she would visit her sister, Donna, in Ohio during

summer breaks from school and that she brought KC along in 2002 to 2004. Karen brought a tape recorder with her during the 2004 trip, and after it disappeared a few times, one of the grandchildren disclosed Kaufman's abuse of KC. The adults confronted Kaufman about the abuse, and Kaufman denied the allegations.

{¶ 25} On cross-examination, Karen described renting motel rooms for family gatherings in Wisconsin in February and April 2002, but did not remember whether the family had all stayed together in motel rooms during Kaufman's trip to Wisconsin to pick up furniture. On redirect examination, Karen stated that when the family stayed at a motel, they always had one room for the women and one room for the men.

{¶ 26} Kaufman did not live at or stay overnight at Donna's house when KC was visiting, but he would spend time there with the family after work, during weekends, and sometimes in the morning. He would come over to the house by himself or with Tracey. When describing the layout and sleeping arrangements at Donna's house, Karen noted that the door to the second-story bathroom did not shut all the way. Karen described Donna's house as a little hectic when all the adults, children, and dogs are there. Karen testified that she had authority over her grandchildren when she brought them on the trips to Donna's house, but also stated that all of the adults were authority figures for the children at Donna's house.

{¶ 27} JB, born October 4, 1987, testified that he and Kaufman were good friends before Tracey and Kaufman "got together." Tracey, Reginald, and Kaufman all worked at LBT, and Tracey became friends with Kaufman while Reginald was away on truck-driving jobs. Tracey married Reginald when JB was six, divorced when JB was ten, and married Kaufman when JB was fifteen.

{¶ 28} Tracey frequently sent JB to Kaufman's house to spend time with him. During those visits, Kaufman was the only adult in the house and was in charge of JB.

When JB stayed with Kaufman in south Youngstown, Kaufman would pick JB up at his school in Niles. JB sometimes stayed with Kaufman only during the day, then started staying with him over weekends, and then overnights during the week.

{¶ 29} JB testified that his friendship with Kaufman became inappropriate when he was approximately five or six years old. JB stated that inappropriate sexual conduct began when he was six or seven years old and physical abuse began when he was ten. Kaufman began to digitally penetrate JB's anus starting at the age of eight, and did so at least once every three months, usually when JB was in Kaufman's bathroom. Between the ages of eight and 11, JB estimated that Kaufman had digitally penetrated his anus 12 to 14 times and had JB perform fellatio two times. JB specified that one instance of fellatio happened in the spring of 1997 and the other during the fall of 1998.

{¶ 30} On cross-examination, JB testified that Kaufman began to touch JB inappropriately around the age of six and that the first instance occurred at Donna's house. JB testified that he told his mother about Kaufman rubbing his buttocks right afterwards, but Tracey did nothing. JB also testified that Kaufman touched him inappropriately at age 11 while washing him after JB had broken his arm in a bicycle accident at a location in New Springfield, Ohio.

{¶ 31} JB testified that he only disclosed Kaufman's abuse recently because he wants to become comfortable with himself so that he can start his own family. JB did not report the sexual abuse to anyone besides Tracey and the police, though he said that Reginald was made aware of Kaufman's physical abuse of JB at some unspecified point.

{¶ 32} JB first spoke with the police in November 2006 and made an official report of sexual abuse to the police in June 2007, after having been out of Ohio. JB

admitted that he did not report the instances of fellatio or the inappropriate touching in New Springfield to the police and said that he did not feel comfortable reporting all of it. JB admitted that he had told the police that the inappropriate touching started at age five rather than six, but said he had just given the police an approximate date and was very ill during the reporting process. On further cross, JB agreed that the touching started at age five. JB stated that Kaufman began penetrating his anus when he was six or seven years old, at Kaufman's house on Berkshire in Youngstown. On further cross, JB agreed that no anal penetration occurred prior to 1997 (which would have been when he was nine and ten years old). On redirect, JB testified that Kaufman's inappropriate touching began at age five or six, anal penetration began at age eight, and the sexual abuse stopped by the time JB was twelve.

{¶ 33} Officer Suzanne Doni-Ellis of the Youngstown Police Department testified that JB filed a police report with her on June 4, 2007, and stated that Kaufman's inappropriate touching began at age five, anal penetration began at age eight, and the abuse stopped by the time JB was 11 or twelve. Ellis did not gather physical evidence due to the remote dates of abuse. During her investigation, Ellis procured reports from police departments in Boardman and Wisconsin regarding KC's 2004 allegations.

{¶ 34} Dr. Paul McPherson was proffered by the state as an expert regarding allegations of sex abuse by children. McPherson did not interview the victims and testified about his general academic knowledge and professional experience with child sexual-abuse victims. McPherson testified that it is common for child victims to delay disclosure of the abuse or to partially disclose the abuse and that it is not common for anal penetration to result in permanent scars. Kaufman cross-examined McPherson on statistics regarding false allegations and hypothetical questions about anal trauma.

{¶ 35} Once the state rested, Kaufman renewed his motion for relief from prejudicial joinder and entered a Crim.R. 29 motion for acquittal, both of which the trial court denied. For Kaufman's case in chief, Officer Doug Flara of the Boardman Police Department Youth and Family Services Division testified that he received a report of sexual abuse from the Milwaukee Department of Child Welfare regarding KC in 2004. Flara interviewed Donna and Kaufman and spoke with Jennifer (KC's step-mother) via telephone. Flara took the case to the prosecutor's office in 2004, but no action was taken on the case until JB's report in 2007.

{¶ 36} Donna testified that she moved to Boardman, Ohio in 1996 and lived in Michigan prior to that. Donna testified that Kaufman drove her up to Wisconsin for her mother's funeral (in February 2002) in her white Buick. Kaufman and KC were both at the bereavement luncheon. Donna stayed up in Wisconsin to deal with her mother's estate, until Kaufman returned in late April 2002 with Tracey, in a moving truck. After a group family dinner, Kaufman and Tracey drove KC and two other boys to the motel where they were staying. Donna testified that the family got two rooms and that Kaufman, Tracey, KC, and KC's step-brother slept in one room. The door between the two adjoining motel rooms was left open, and Donna did not notice anything strange that night.

{¶ 37} When Karen and the grandchildren came to visit Donna in the summers of 2002 to 2004, eight people stayed at Donna's house, and additional people, including Kaufman and Tracey, would spend time there during the day. Donna testified that the bathroom doors at her house could not shut due to mistakes made during remodeling. During the family visits to Donna's house in 2002 to 2004, Donna had not noticed any strange behavior and was shocked by KC's allegations in 2004.

{¶ 38} Tracey testified that she was married to Frederick from 1987 to 1991, and

had one child with him, JB. She had one child, RT, with Reginald in 1994 and was married to Reginald from 1995 to 1999.

{¶ 39} Tracey testified that she met Kaufman in early 1996 and that she began to work for LBT in late 1996. Tracey testified that Kaufman met JB in the fall of 1997 and that she would send JB to stay with Kaufman when she was having marital difficulties with Reginald. JB did not report any abuse to her, and Tracey first found out about the abuse when JB made the police report in 2007. JB would stay with Kaufman a few times a month, only on the weekends, and Kaufman never drove JB to school in Niles.

{¶ 40} In 2000, Tracey moved in to Kaufman's house on Berkshire. Tracey testified that the shower at Kaufman's house did not work and was never fixed. Tracey and Kaufman were married in 2001 and had a son in 2005.

{¶ 41} Tracey provided testimony identical to Donna's regarding the family trip to Wisconsin in late April 2002, though Tracey stated that the door between the two adjoining motel rooms did not stay open the entire time. Tracey stated that she got up during the night at the motel and did not notice anything strange.

{¶ 42} In Tracey's description of the family visits to Donna's house in the summers of 2002 to 2004, Tracey said that she stayed close to Kaufman the whole time, because she did not know his family very well.

{¶ 43} Kaufman testified that he started working at LBT in 1991. He bought his house on Berkshire Drive in Youngstown in April 1996. Kaufman's exhibit 14, an inspection report on the Berkshire house, stated that there was one bathroom in the house, and that "Shower head is damaged. Shower head replacement is recommended. No water pressure to shower. (Repairs needed.)" Kaufman never fixed the shower and testified that it still does not work.

{¶ 44} Kaufman testified that he met JB in the fall of 1997, when JB was nine or ten. Kaufman testified that he still lived in Austintown when he first started spending time with JB and would have JB stay the night one or two times a month. Kaufman had a "big brother/little brother" relationship with JB from 1997 to 1999 and started to spend time with JB and Tracey "as a family" in 1999.

{¶ 45} Kaufman's testimony addressed JB's claim that Kaufman had touched him inappropriately after JB had broken his arm in a bicycle accident. Kaufman stated that the bike accident occurred during a camping trip in Pennsylvania and that JB had never been to New Springfield, Ohio. Kaufman's testimony otherwise generally duplicated most of the defense testimony already presented, and Kaufman denied ever having touched either victim inappropriately.

{¶ 46} At the close of trial, Kaufman renewed his motions for acquittal and relief from prejudicial joinder, which the trial court denied. After a day of deliberations, the jury returned a guilty verdict for each of the nine counts against Kaufman. On March 24, 2008, the trial court held a sentencing hearing and imposed four consecutive life sentences for the rape convictions, an additional consecutive life sentence for the felonious-sexual-penetration conviction, and four consecutive five-year sentences for the gross-sexual-imposition convictions.

{¶ 47} Kaufman timely filed the present appeal, asserting ten assignments of error. We will address Kaufman's assignments of error in an order that facilitates our analysis of the issues raised therein.

## Insufficient Evidence

{¶ 48} In his fourth of ten assignments of error, Kaufman asserts:

{¶ 49} "Appellant Was Denied Due Process and the Liberties Secured by the United States Constitution and Ohio Const. Art. I, §§ 1, 2, 10 and 16 When He Was

Convicted of the Life Offenses of Rape upon Insufficient Evidence."

{¶ 50} Kaufman argues that his special felony rape convictions were based on insufficient evidence because the state did not provide proof of force.

{¶ 51} In reviewing a challenge of insufficient evidence, "the inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds. The court does not examine the credibility of the witnesses, nor does it weigh the evidence in this process. *State v. Goff* (1998), 82 Ohio St.3d 123, 139, 694 N.E.2d 916. Sufficiency of the evidence is a test of adequacy, used to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6 Ed.1990) 1433. This is a burden of production, not of persuasion. *Thompkins* at 390. A reviewing court should not disturb the decision below unless it finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Jenks* at 273.

{¶ 52} Kaufman was convicted of four counts of rape of a person under 13, in violation of R.C. 2907.02(A)(1)(b), the elements of which are not argued in this assignment of error. Pursuant to the version of R.C. 2907.02(B) in effect at the time of the commission of the offenses, a conviction of R.C. 2907.02(A)(1)(b) is sentenced as a first degree felony, but carries a mandatory life sentence if there is a finding that the offender "purposely compels the victim to submit by force or threat of force."

{¶ 53} The force element is defined as follows: "Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or

thing." R.C. 2901.01(A)(1). Force or the threat of force "can be inferred from the circumstances surrounding sexual conduct." *State v. Schaim* (1992), 65 Ohio St.3d 51, 600 N.E.2d 661, at paragraph one of the syllabus. In order to make a finding of force under R.C. 2907.02, "some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye* (1998), 82 Ohio St.3d 323, 327, 695 N.E.2d 763. However, the Ohio Supreme Court has explained that the force necessary to commit rape depends upon the respective age, size, and strength of the parties and their relation to each other. *Eskridge*, 38 Ohio St.3d at 58, 526 N.E.2d 304. Thus, the context of the rape will also affect our inferences regarding the additional element of force or threats of force. In the case of a child victim, a person in a position of authority over the victim can be convicted of rape with the force specification "without evidence of express threat of harm or evidence of significant physical restraint." *Dye* at syllabus.

{¶ 54} Kaufman argues that his rape convictions were based on insufficient evidence because the state did not provide evidence that Kaufman had used force or threats of force against either victim. Kaufman also contends that the inference of psychological force in *Eskridge* and *Dye* does not apply in this case because Kaufman was not an authority or parent figure for either of the victims. Kaufman contends that he was merely "an adult who had met these boys."

{¶ 55} It is true that the law does not impute an authoritative relationship merely because the victim is a child and the defendant is an adult. See *State v. Drayer,* 10th Dist. No. 03AP-1033, 2004-Ohio-5061, at ¶31, vacated on other grounds by *State v. Drayer*, 159 Ohio App.3d 189, 2004-Ohio-6120, 823 N.E.2d 492. However, an adult need not be the child's parent in order to establish that the child felt obligated to obey him. *Dye*, supra. In *Dye*, the defendant was merely the victim's neighbor, but there was direct proof that the defendant was acting in loco parentis, as there was testimony

that the victim's mother specifically instructed the victim to obey the defendant when in his charge or else she would bring him home. *Dye*, 82 Ohio St.3d at 328-329. In other cases, the child's belief that he must obey the adult has been established even without specific instruction from the victim's parent that the defendant was to be obeyed in place of the parent. See, e.g., *State v. Milam*, 8th Dist. No. 86268, 2006-Ohio-4742 (defendant was in a position of authority with regard to the victim because he was the father of one of the victim's friends, the victim spent many nights at the defendant's home, and the victim testified that the defendant was "in charge" of him while at the defendant's home); *State v. Haschenburger*, 7th Dist. No. 05 MA 192, 2007-Ohio-1562 (defendant manipulated his relationship as a family friend to condition the victim to think that she should comply with his demands).

{¶ 56} In this case, Kaufman had a long-standing relationship with JB's mother, first as a friend, then live-in boyfriend, then husband, though the marriage occurred after the dates of the charged offenses for JB. JB's mother testified that she would send JB to stay overnight at Kaufman's house when she was experiencing difficulties with her previous husband, Reginald. JB testified that he would have to obey Kaufman if Kaufman told him what to do. JB did not respect Kaufman as an authority figure, but specified that Kaufman was in charge when JB was in his care. JB stated that he was frightened of Kaufman.

{¶ 57} In addition to ongoing incidents of sexual touching and digital-anal penetration, JB testified that on two specific occasions, during the time periods of each of rape counts, "I was in the process of getting out of the shower, and [Kaufman] grabbed me and pulled my head down * * * [and] I was forced to suck his penis." JB also testified to a specific incident, during the time period of the second rape count, where Kaufman both physically assaulted JB and forcefully penetrated his anus for an

extended period of time, causing him to bleed.

{¶ 58} The foregoing testimony indicates that Kaufman was an authority figure to JB. He was repeatedly entrusted to care for JB by JB's mother, and JB felt obligated to obey Kaufman. The sexual acts occurred either while JB was under Kaufman's sole supervision, or during a period when Kaufman was living with JB and his mother, Tracey. JB repeatedly described being "forced" by Kaufman to perform sexual acts with him and described at least one incident of Kaufman inflicting physical violence on JB in conjunction with a sexual act. The state therefore presented sufficient evidence that Kaufman was in a position of authority over JB, that JB's will was overcome by fear or duress, and that JB's will was overcome on at least one occasion by physical violence. Given the totality of the evidence presented by the state, reasonable minds could conclude that the rape counts against JB were committed with force or threat of force.

{¶ 59} As for the force specifications on Counts 6 and 8, Kaufman did not have a similar long-standing relationship with KC. KC testified that he had first met Kaufman when Kaufman was visiting in Wisconsin in 2002 and saw Kaufman three other times, during KC's short visits to Kaufman's mother's house in Ohio during the summers of 2002 to 2004. Kaufman's mother was KC's step-mother's aunt, and KC called Kaufman "Uncle Mikey." KC testified that Kaufman was not one of the adults responsible for telling KC what he could or could not do when he was staying at Kaufman's mother's house. However, KC also testified that Kaufman was an authority figure in Kaufman's mother's house. Kaufman did not live at or stay overnight at his mother's house when KC was there, but he would visit with the family after work or during weekends. KC's step-grandmother, Karen, testified that "all of the adults" were the authority figures at Donna's house when the family got together there.

{¶ 60} KC described the first incident in 2002 with Kaufman, which was outside the jurisdiction of the trial court and not included in the counts in this case, but explained the background of his relationship with Kaufman. KC testified that as he was getting out of Kaufman's car in a parking lot of the motel where they were staying and scratched the car next to him with the door of Kaufman's car, Kaufman "said that he would call the sheriff and tell them that I scratched the car next to me, or I could receive punishment [from Kaufman]. And I was scared because I didn't really want to be in trouble with the police, so -- I was a little kid. I didn't know. And so I chose the punishment because I thought it would be a lot easier. I didn't know what it was." During that night at the motel, Michael woke KC and "said it was time for the punishment," which was to perform oral sex on Kaufman. KC testified that he was afraid of Kaufman. KC also stated that he did not tell anyone what happened at that time because he was scared that Kaufman "might do something" or get KC in trouble for scratching the car.

{¶ 61} During the summer of 2002 and 2003, when KC was in Ohio visiting his extended family, Kaufman would get KC alone and continue the "punishment," which involved striking KC's testicles, digitally penetrating KC's anus, or KC and Kaufman performing fellatio on one another. KC testified that it was Kaufman who removed KC's pants during each incident. KC stated that he did what Kaufman said because he was scared and did not want to get in trouble. KC also said that he did not tell anyone about what Kaufman did during the summer 2002 incidents because KC was scared. Shortly before the summer 2004 visit, KC told his step-siblings about the abuse. KC testified that Kaufman asked KC during his 2004 visit if he had told anyone about their sexual interactions and that Kaufman "seemed kind of angry." KC denied telling anyone because he was afraid of what Kaufman would do.

{¶ 62} Based *solely* on their distant familial relationship, the evidence is insufficient to allow the court to use the *Eskridge* inference of psychological force. See 38 Ohio St.3d at 58. Kaufman was never in charge of caring for KC, nor was he acting in loco parentis at any point, and was instead merely one of the adults at the house during family gatherings. However, Kaufman placed himself in a position of authority over KC when he said that he would punish KC for damaging the car and that if KC did not acquiesce to Kaufman's punishment, then Kaufman would get him into even more trouble. This is coupled with the fact that KC was of tender years and small for his age during the two offenses charged.

{¶ 63} Additionally, Kaufman did in fact physically harm KC by repeatedly striking him in the testicles. It appears that striking his testicles was not intended to subdue KC for the purpose of committing other sexual acts, but was one of the sexual acts in and of itself. Nonetheless, the physical violence, the age disparity between the parties, the threats of worse punishment, and Kaufman's assertion of authority as an adult who had the power to discipline KC all indicate that KC's will was overcome by fear and duress, and he felt compelled to submit. Given the totality of the evidence presented by the state, reasonable minds could conclude that the rape counts against KC were committed with force or threat of force.

{¶ 64} The force element in each of Kaufman's rape convictions was based on sufficient evidence; thus, Kaufman's fourth assignment of error is meritless.

## Manifest Weight of the Evidence

{¶ 65} In his third of ten assignments of error, Kaufman asserts:

{¶ 66} "The trial court denied Appellant due process under the Fourteenth Amendment in that his conviction was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented."

{¶ 67} Kaufman argues that the convictions were against the manifest weight of the evidence due to the number of contradictions in testimonial evidence and the lack of physical evidence of the crimes.

{¶ 68} When a court conducts a manifest-weight analysis, it weighs all of the evidence and reasonable inferences, considers the credibility of each witness, and determines whether the fact-finders clearly lost their way in resolving conflicts in the evidence to the point that they "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins,* 78 Ohio St.3d at 387. The factors that a reviewing court may consider in a manifest-weight analysis include whether the evidence was incredible; whether the evidence was uncontradicted; whether a witness was impeached; what was not proved; the certainty of the evidence; the reliability of the evidence; whether any witness's testimony was self-serving; and whether the evidence was vague, uncertain, conflicting, fragmentary, or illogical. *State v. Brown,* 7th Dist. No. 03 MA 231, 2005-Ohio-4502, at ¶35-45. See also *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23-24, 514 N.E.2d 394, citing *State v. Mattison* (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926, syllabus.

{¶ 69} The manifest-weight analysis is a broader inquiry into the original trial, but allows for a reversal only in exceptional circumstances. *Thompkins* at 387. This is because the trier of fact was in the best position to determine the credibility of the witnesses and the weight due to the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. Thus the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact "unless it is patently apparent that the factfinder lost its way." *State v. Woulard,* 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, at ¶81.

{¶ 70} Kaufman lists three main factors as going against the weight of the evidence: the lack of physical evidence to corroborate the claims, contradictions of the details of KC's testimony, and contradictions of the details of JB's testimony.

{¶ 71} As for the physical evidence argument, there is no requirement that testimonial evidence of sexual abuse must be corroborated by physical or other evidence. See *In re Hollobaugh*, 7th Dist. No. 08 MA 22, 2009-Ohio-797, at ¶21. The lack of physical evidence in this case is understandable, given that this case was prosecuted years after the abusive acts were alleged to have occurred.

{¶ 72} As for KC's testimony, Kaufman points to conflicting testimony about certain details during the first instance of abuse in Wisconsin and whether or not the bathroom door at Donna's house could be shut or locked.

{¶ 73} KC testified that Kaufman had been driving a red Firebird during a trip to Wisconsin, but defense witnesses testified that Kaufman had been driving a moving truck and a white Buick. There also were conflicts as to which trips to Wisconsin were made, when they were made, and which people stayed in which hotel rooms. These conflicts surround events that were not charged against Kaufman and were only described as background information. Thus, these conflicts were not material to the case against Kaufman and at most would have spoken to KC's overall credibility.

{¶ 74} KC described Kaufman as having abused him during the weeks that he visited Donna in Ohio and described the abuse as happening in the attic, the basement, and the second-floor bathroom. On cross-examination, KC stated that he did not remember Kaufman locking any doors when they were in the basement or the attic, but that he remembered Kaufman locking the second-story bathroom door. Witnesses for both the state and the defense testified that the door to the second-story bathroom did not shut all the way and could not be locked.

{¶ 75} Kaufman has pointed out a few inconsistencies in KC's testimony, but KC otherwise gave detailed testimony about all of the events pertinent to the case and provided consistent testimony as to the facts that satisfied the elements of the offenses charged against Kaufman. Taking into account inconsistencies or conflicting evidence while weighing the credibility of an individual witness is well within the province of the jury. Kaufman has not demonstrated that the evidence as it pertained to KC was so inconsistent that no reasonable jury could have believed him. The convictions regarding KC were therefore not against the manifest weight of the evidence.

{¶ 76} As for JB's testimony, Kaufman points to inconsistencies in his description of events that occurred before, during, and after the time periods of the charges in order to argue that JB's overall credibility was undermined. Kaufman also specifically argues that the conflicting testimony of other witnesses as to when JB first met Kaufman rendered Counts 3 and 9 to be factually impossible and therefore against the manifest weight of the evidence. The three time periods of the convictions are October 1995 to 1996 (Counts 3 and 9), October 1996 to 1997 (Counts 1 and 4), and October 1997 to 1998 (Counts 2 and 5).

{¶ 77} JB testified that Kaufman began to touch JB inappropriately around the age of 6 (October 1993 to 1994) and that the first instance occurred at Kaufman's mother's (Donna) house. Kaufman and Donna testified that Donna lived in Michigan at that time and did not move to Ohio until 1996. JB also testified that Kaufman touched him inappropriately at age 11 (October 1998 to 1999) while washing him after JB had broken his arm in a bicycle accident at a location in New Springfield, Ohio. Tracey and Kaufman testified that JB had fractured his arm in a bicycle accident during a camping trip in Pennsylvania and that JB had not been to New Springfield. Additionally, Kaufman points out that JB agreed during cross-examination that no anal

penetration occurred before 1997. However, JB also testified on direct and redirect examination that the first instance of anal penetration occurred when he was eight years old, which would have been between October 1995 and October 1996.

{¶ 78} JB testified that his mother Tracey met Kaufman through LBT. JB's ex-stepfather, Reginald, worked for LBT. No one testified as to when they thought Reginald started working at LBT, though he started some time before Tracey did, and possibly before Kaufman did, though the testimony is unclear. Kaufman started working at LBT in 1991. JB did not testify as to when he thought his mother started working at LBT, though he said that Tracey and Kaufman became friends while Reginald was "on the road" working for LBT.

{¶ 79} Tracey testified that she met Kaufman in early 1996, that she began to work for LBT in late 1996, and that she became friends with Kaufman at that time. Tracey and Kaufman testified that Kaufman had met JB in the fall of 1997. However, Kaufman also testified that he had met JB while Kaufman was living in Austintown, before he had the house on Berkshire Drive in Youngstown, which occurred in April 1996. Although the defense testimony severely undermines JB's credibility regarding his descriptions of Kaufman's abuse from 1993 to 1995, Kaufman's own testimony could support the contention that Kaufman knew JB during all of the dates between 1995 and 1998 in the indictment.

{¶ 80} Thus, although Kaufman claims that the defense testimony that JB met Kaufman in 1997 proved that the counts in October 1995 to 1996 were factually impossible, the testimony offered by both sides was incomplete, inconsistent, and vague. The matter comes down to a question of overall credibility, which the jury apparently resolved in favor of JB.

{¶ 81} Kaufman further points to inconsistencies in JB's testimony to argue that

the remainder of the convictions against Kaufman involving JB, were against the manifest weight of the evidence. Kaufman asserts that JB's claims that most of the molestation occurred during or after getting out of the shower at the house on Berkshire were impossible because the shower did not work. Kaufman's Exhibit 14, an inspection report on the Berkshire house, stated that there was one bathroom in the house, and that "Shower head is damaged. Shower head replacement is recommended. No water pressure to shower. (Repairs needed.)" Tracey and Kaufman both testified that the shower did not work and was never fixed.

{¶ 82} However, given that there was only one bathroom in Kaufman's house on Berkshire, it does not necessarily follow that JB's claims were factually impossible. Although Kaufman offered testimony that contradicted JB's testimony, the defense did not unequivocally impeach JB's testimony regarding abuse that occurred in 1995 to 1996 or abuse that occurred in the bathroom of Kaufman's house.

{¶ 83} Kaufman was able to strongly call into question the accuracy or believability of JB's testimony as compared to KC's testimony. But JB otherwise gave detailed testimony about all of the events pertinent to the case, and provided consistent testimony as to the facts that satisfied the elements of the offenses charged against Kaufman. Moreover, a defendant "is not entitled to reversal on manifest weight grounds merely because inconsistent evidence was offered at trial, 'as "[t]he trier of fact is free to believe or disbelieve any or all of the testimony presented.'" *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, at ¶10. The jury was permitted to believe or disbelieve any of the testimony presented, and we still must give deference to the jury's determination of the credibility of the witnesses. Kaufman has not demonstrated that JB's testimony was so inconsistent that no reasonable jury could have believed him. A jury could have found JB to be the more credible witness

without having lost its way.

{¶ 84} Although the issue is close given that the overall credibility of JB was extremely questionable, this is not one of the exceptional cases in which the evidence weighs heavily against the defendant's convictions, warranting reversal. Therefore, Kaufman's convictions were not against the manifest weight of the evidence, and his third assignment of error is meritless.

**Limitation of Cross-Examination in Violation of the Confrontation Clause**

{¶ 85} In his second of ten assignments of error, Kaufman asserts:

{¶ 86} "The Trial Court Erred in Limiting the Scope of Cross Examination Thereby Depriving Appellant of His Constitutional Right Of Confrontation and Cross Examination in Violation of U.S. Const. Amend V, VI, XIV and Ohio Const. Art. I §10 &16."

{¶ 87} Kaufman asserts that the trial court violated his right to confront witnesses by not allowing Kaufman to cross-examine JB regarding his juvenile adjudication for the molestation of his step-brother, RT. The state counters that the elicitation of such testimony was barred by Evid.R. 609(D), R.C. 2151.357(H), and R.C. 2907.02(D).

{¶ 88} A trial court enjoys broad discretion regarding the admissibility of evidence. Thus, an appellate court should not disturb the trial court's decision absent an abuse of discretion. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶66; *State v. Shoop* (1993), 87 Ohio App.3d 462, 469, 622 N.E.2d 665. Because JB's adjudication involved matters of a sexual nature, the limitations of the rape-shield statute applied. Pursuant to the rape-shield statute, evidence of specific instances of a victim's sexual activity is inadmissible "unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a

fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." R.C. 2907.02(D).

{¶ 89} The rape-shield statutes were designed to prohibit evidence that is extremely inflammatory and prejudicial and only marginally probative. *State v. Gardner* (1979), 59 Ohio St.2d 14, 17, 13 O.O.3d 8, 391 N.E.2d 337. "The court, in determining whether prior acts should be admitted, must balance the interests of the victim, which the statute is designed to protect, and the defendant's right to confront and cross-examine the state's witnesses. *State v. Williams* (1986), 21 Ohio St.3d 33, 21 OBR 320, 487 N.E.2d 560. If the evidence in question is merely being used to impeach the victim's credibility, it is not of probative value as to the alleged rape itself and should not be admitted. Id. However, if the evidence has probative value to the determinative issue of fact -- i.e., whether the victim was raped by the defendant on the date alleged -- then the probative value of the testimony outweighs any interest the state has in exclusion. Id. at 36." *State v. Yenser*, 176 Ohio App.3d 1, 2008-Ohio-1145, 889 N.E.2d 581, at ¶4. See also *State v. Gardner* (1979), 59 Ohio St.2d 14, 18, 13 O.O.3d 8, 391 N.E.2d 337; *State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265; *State v. Guthrie* (1993), 86 Ohio App.3d 465, 621 N.E.2d 551.

{¶ 90} On cross-examination, JB stated that he hated Kaufman starting from the time he, JB, was no longer allowed to see his family. Counsel asked JB to specify, to which JB responded, "Soon after I had moved in with my father, I was no longer allowed to come over, nor was I permitted to call my mother." Counsel continued:

{¶ 91} "Q: What you were complaining about is that you were not able to see your stepbrother [RT]; is that right?

{¶ 92} "A: And my mother.

{¶ 93} "Q: And you're attributing that to Michael Kaufman; is that right?

{¶ 94} "A: Yes."

{¶ 95} Counsel then had a side bar and asked to bring in extrinsic evidence of JB's juvenile adjudication for the molestation of RT, in order to impeach his testimony. Counsel intended to show that JB was removed from his mother and Kaufman's house due to the adjudication. The state asserted that JB did not make claims as to why he had to move out of the home, and moreover, it was Tracey's decision to kick JB out of the house, not any order from the juvenile court. Additionally, the state noted that allowing the evidence would open the door for the state to introduce testimony regarding Kaufman's alleged sexual abuse of RT, whose testimony had previously been barred as "other acts" evidence. The trial court decided that the matter was collateral and did not allow Kaufman to bring in extrinsic evidence of the adjudication. Upon further questioning, counsel asked JB why his mother and Kaufman wanted him out of the house, and JB responded that he did not know why. Counsel renewed his motion, and the trial court stated that Kaufman was stuck with the answer he received.

{¶ 96} The question of exactly why JB hated Kaufman or what events led to JB being kicked out of his mother's and Kaufman's home are issues collateral to the case. The admission of evidence that JB had been adjudicated for the molestation of his younger brother would not help to prove or disprove any of the elements of any charges against Kaufman. It would have served only to impeach JB's credibility. Because the evidence served only to impeach JB and did not have any probative value regarding a material issue in the case, the evidence was inadmissible. The trial court's decision to bar such cross-examination was therefore not in error, let alone an abuse of discretion.

{¶ 97} Additionally, although the topic of JB's adjudication was raised during pretrial discussions, Kaufman did not request a hearing or otherwise move the court to

consider the admissibility of such evidence three or more days before trial as dictated by the rape-shield statute. R.C. 2907.02(E). Because Kaufman failed to give the statutorily required notice and request for hearing, he has waived the issue.

{¶ 98} Finally, even if JB's adjudication had not involved evidence of JB's prior sexual activity, the evidence nonetheless would have been barred by Evid.R. 609(D), which provides that evidence of a juvenile adjudication is not admissible for impeachment except as provided by statute. In his argument on appeal, Kaufman has not provided any statutory justification for the introduction of JB's adjudication, aside from R.C. 2151.357(H), which explicitly states that adjudication cannot be used for the purpose of impeaching the credibility of a witness. As discussed above, proof that JB had been adjudicated at age 13 for molesting RT did not go to a material issue to Kaufman's case, and thus the attempted use was only for the purpose of impeaching JB's credibility. Again, the decision to prohibit the introduction of JB's juvenile adjudication was not error. Accordingly, Kaufman's second assignment of error is meritless.

## Improper Jury Instructions

{¶ 99} In his fifth of ten assignments of error, Kaufman asserts:

{¶ 100} "Appellant Was Denied Due Process, a Fair Trial and the Liberties Secured by the United States Constitution Amend. V & XIV and Ohio Const. Art. I, §§ 10 and 16 When the Trial Court Gave a Jury Instruction Which Eliminated the States Obligation to Prove Each Element of the Offense of Rape."

{¶ 101} Kaufman argues that the trial court improperly provided the jury with the *Eskridge* definition of psychological force, given that the state did not provide sufficient evidence that Kaufman was in a position of trust or authority over the victims. See 38 Ohio St.3d at 58.

{¶ 102} A trial court is obligated pursuant to Crim.R. 30(A) to provide all jury instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as a fact-finder. *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640. "Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights." *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶36, quoting *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶97. A specific jury instruction is allowed only if it is applicable to the facts of the case. *Murphy v. Carrolton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828.

{¶ 103} We review a trial court's decision to give or not to give a particular jury instruction under an abuse-of-discretion standard. *Sicklesmith v. Chester Hoist*, 169 Ohio App.3d 470, 2006-Ohio-6137, 863 N.E.2d 677, at ¶15. An abuse of discretion connotes more than an error of law or judgment; it implies an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 104} The state moved the trial court to include the *Eskridge* definition of force during jury instructions. See 38 Ohio St.3d at 58. The trial court provided the following information on the force specifications:

{¶ 105} "The purpose to compel someone to submit must be by force or threat of force. Force means any violence, compulsion or constraint, physically exerted by any means upon or against any person or thing.

{¶ 106} "Threat includes any direct threat or any indirect threat.

{¶ 107} "Resistance, the prosecutor need not prove that the victim physically resisted the defendant.

{¶ 108} "The court instructs you that when the relationship between the victim

and the defendant is one of child and parent or stepparent or steprelative or other similar authority figure, the element of force need not be openly displayed or physically brutal. It can be subtle or slight or psychological or emotionally powerful. Evidence of an expressed threat of harm, or evidence of significant physical restraint is not required.

{¶ 109} "If you find beyond a reasonable doubt that under the circumstances in the evidence, the victim's will was overcome by fear or duress or intimidation, then the element of force has been proved."

{¶ 110} Kaufman does not take issue with any of the wording of the trial court's instructions. Kaufman simply contends that the *Eskridge* portion of the instruction as a whole should not have been included because of his insufficient-evidence claim. Pursuant to our analysis in Kaufman's fourth assignment of error, the state presented sufficient evidence that Kaufman was in a position of authority over the victims. Moreover, the language of the instructions indicates that the trial court did not tell the jury that they must find Kaufman to have been in a position of authority over the victims. Instead, the trial court explained that a finding of an authoritative relationship was a condition precedent for the use of the relaxed "psychological force" standard. The jury was free to use either force definition provided, depending on their findings regarding the relationship between Kaufman and the victims.

{¶ 111} There was sufficient evidence for the trial court to present the question of Kaufman's position of authority over the victims and thus the *Eskridge* definition of force. The trial court properly instructed the jury, and Kaufman's fifth assignment is meritless.

### Abuse of Discretion to Allow Expert Testimony

{¶ 112} In his sixth of ten assignments of error, Kaufman asserts:

{¶ 113} "It was An Abuse of Discretion for The Trial Court to Permit 'Expert' Testimony Without the Expert having Any Factual Basis for the Testimony Offered. Thereby denying Appellant's Right to Due Process Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, 16 of the Ohio Constitution."

{¶ 114} Kaufman argues that the expert testimony of Dr. Paul McPherson should not have been admitted because it merely bolstered the credibility of the victims, the general nature of the testimony rendered it irrelevant to the case, it involved information within the general knowledge of the jury, and it was not based on McPherson's first-hand knowledge about the victims.

{¶ 115} A trial court's determination of the admissibility of expert testimony is reviewed for abuse of discretion. *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶9. An abuse of discretion "suggests unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court to substitute its judgment for that of the trial court." Id. See also *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 116} Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met. *State v. Nemeth* (1998), 82 Ohio St.3d 202, 207, 694 N.E.2d 1332, citing *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

{¶ 117} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ 118} "(B) The witness is qualified as an expert by specialized knowledge,

skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 119} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 120} Additionally, Evid. R.703 provides as follows:

{¶ 121} "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

{¶ 122} Thus, according to Evid.R. 702 and 703, McPherson's testimony must be needed to assist the jury, he must be adequately qualified as an expert on the specific subject matter, his testimony must be based on reliable information, and the information or opinion that he shares must be based on admitted evidence or on facts that McPherson has perceived.

{¶ 123} Kaufman does not raise issue with McPherson's general qualifications and seems to concede that it was not error to qualify McPherson as an expert in his field. McPherson was allowed to testify regarding his academic knowledge and professional experience with child sexual-abuse victims. McPherson testified that it is common for child victims to delay disclosure of the abuse or to partially disclose the abuse and that it is not common for anal penetration to result in permanent scars. The parties do not dispute that McPherson did not interview either victim or testify as to the specific facts regarding either victim. Further, the parties do not dispute the fact that McPherson did not give any opinion regarding JB's or KC's credibility or the veracity of their testimony. The court limited McPherson's testimony to general information and refused to allow specific hypothetical examples. Kaufman extensively cross-examined McPherson on statistics of false allegations and hypothetical questions about anal trauma.

{¶ 124}  As his first argument, Kaufman contends that McPherson's testimony was inadmissible because he merely functioned as an advocate and bolstered the credibility of the victims.  Kaufman cites *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, in support of his argument.  However, in *Butcher*, the witness's testimony was inadmissible because it was a violation of the rules against hearsay.  Id. at ¶66.  The trial court in *Butcher* permitted the witness's testimony of the victim's statements through the medical hearsay exception.  Id. at ¶52.  The appellate court found that the context of the medical interview was to collect evidence, not to diagnose, and there had been no voir dire of the victims.  Id. at ¶66-71.  Because that witness was a manufactured witness for the state, the hearsay testimony was not inherently reliable under the medical hearsay exception.  In the case at hand, the trial court was not concerned with the inherent reliability of McPherson's hearsay statements because McPherson offered no hearsay testimony.  As for Kaufman's contention that McPherson merely acted to bolster the credibility of the victims, it is well established that expert testimony that bolsters a victim's credibility is permissible. *State v. Jordan*, 7th Dist. No. 06 HA 586, 2007-Ohio-3333, at ¶24, citing *State v. Stowers* (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d. 881.

{¶ 125}  Kaufman's argument attempts to create an expert-advocate dichotomy out of the medical professional-advocate dichotomy under Evid.R. 803(4).  Such a dichotomy does not exist under the rules of evidence applicable to this case, Evid.R.702 and 703.  An expert witness's first-hand testimony, like any other witness's first-hand testimony, can be believed or disbelieved by the finder of fact and there is no requirement that all experts only provide "inherently reliable" testimony.  Kaufman's first argument is therefore not well taken.

{¶ 126}  As his second argument, Kaufman contends that McPherson's testimony

was so general that it did not make the existence of any material fact in the case more or less probable and was thus inadmissible pursuant to Evid.R. 401 and 402. However, evidence that impeaches or bolsters witness credibility "is of consequence to the action because it might determine whether the jury believes a particular witness." *State v. Moore* (1988), 40 Ohio St.3d 63, 65, 531 N.E.2d 691. Moreover, an expert witness is permitted to testify about general information which allows the finder of fact to draw its own conclusion. See, e.g., *State v. Buell* (1986), 22 Ohio St.3d 124, 131, 22 OBR 203, 489 N.E.2d 795 (allowing expert testimony concerning factors that might impair the accuracy of a typical eyewitness identification). The Ohio Supreme Court has specifically stated that testimony from a qualified expert on the general behavioral characteristics of sexually abused children is admissible. *State v. Stowers* (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d. 881. As Kaufman himself argued, McPherson's testimony functioned to bolster the credibility of the victims, specifically the common patterns of disclosure of child sex-abuse victims. McPherson's testimony was therefore not inadmissible due to relevancy issues. Kaufman's second argument is therefore not well taken.

{¶ 127} As his third argument, Kaufman argues that McPherson's testimony was inadmissible under Evid.R. 702(A) because he offered no specialized knowledge outside the realm of the common knowledge of the jury. Kaufman primarily relies on *State v. Roquemore* (1993), 85 Ohio App.3d 448, 620 N.E.2d 110, in support of his argument. The expert testimony in *Roquemore* was an opinion on whether a violent "type" of person would have committed the crime in question based on a crime-scene photograph assessment and comparison with statistics on other violent crimes. Id. at 453-454. In essence, the expert witness testified that because the crime scene was disorganized, the crime was committed in a violent rage. Id. at 454. Such testimony

not only contravened Evid.R. 702(A) because the jury was able to determine whether something violent had happened at the scene, but the testimony was also questionable under Evid.R. 705 for a lack of statistical reliability, under Evid.R. 403(A) for the prejudicial way in which the defendant was profiled or stereotyped, and under Evid.R. 404(A) for imputing a violent character to the defendant without the issue of the defendant's character having been raised. Id. at 454-456. Such issues are not applicable in this case.

{¶ 128} Instead, it is established in Ohio law that the average fact-finder may require assistance in understanding the "behavioral characteristics of minor victims of sexual abuse." *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, at ¶56, discussing *Stowers*, supra. This includes the characteristics of typical child victims in regard to their disclosure of the abuse. See *State v. McGlown,* 6th Dist. No. L-07-1163, 2009-Ohio-2160, at ¶41; *State v. Bortner*, 9th Dist. No. 02CA008189, 2003-Ohio-3508, at ¶46. The trial court in this case allowed McPherson to testify to help the jury better understand the behavioral characteristics of child sex-abuse victims that a layperson might not normally take into account, provided that McPherson did not testify as to the veracity of the victims' statements. The trial court allowed the testimony in accordance with current Ohio case law and with Evid.R. 702(A) and was thus not an abuse of discretion. Kaufman's third argument is not well taken.

{¶ 129} As a fourth argument, Kaufman argues that McPherson's testimony was inadmissible pursuant to Evid.R. 703 because he had no first-hand knowledge about the victims. Kaufman relies on cases in which experts testified regarding the consistency of the particular victim's behavior with that generally observed in other victims. Kaufman argues that those cases should not apply here, because McPherson

had no information about JB and KC. It is true that McPherson's testimony would have been inadmissible had he offered specific conclusions about JB and KC without being given any information about them. However, McPherson did not provide any specific conclusions about JB and KC.

{¶ 130} Evid.R. 703, as it applies to this case, does require that McPherson testify only about facts that he has perceived. However, it does not require that he testify on facts specific to the case. As noted above, an expert witness is allowed to testify about general background information that might assist the fact-finder. *Buell*, supra. See also, e.g., *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 437-438, 715 N.E.2d 546 (providing general statistics on railroad crossings); *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038 (providing general expert testimony regarding gang culture). The Rules of Evidence do not require that an expert witness provide a factual link between his general testimony and the specific facts of a case. As to the information imparted by McPherson, Kaufman does not argue that his statistics were unfounded or that he gave inaccurate information regarding his personal professional experience with children making allegations of sexual abuse. Thus, McPherson's testimony was admissible pursuant to Evid.R. 703, and Kaufman's fourth argument is not well taken.

{¶ 131} In summary, McPherson's testimony was within the permissible bounds of the Rules of Evidence. McPherson testified about characteristics of sexually abused children. He made no comparison between those generalities within his expertise and the victims in question. He offered no opinion as to whether JB and KC had in fact been sexually abused, whether he believed the testimony of JB and KC, or whether JB and KC were credible witnesses. McPherson only provided information regarding common patterns of child-abuse victims in order to assist the jury in their assessment

of JB and KC's credibility. Because the trial court did not abuse its discretion by allowing McPherson to testify, Kaufman's sixth assignment of error is meritless.

### Prosecutorial Misconduct

**{¶ 132}** In his tenth of ten assignments of error, Kaufman asserts:

**{¶ 133}** "Appellant Was Denied Due Process, a Fair Trial and the Liberties Secured by the United States Constitution Amend. XIV and Ohio Const. Art. I, §§ 10 and 16 As a Result of the Improper Questions and Arguments of the Prosecutor."

**{¶ 134}** Kaufman contends that the state committed prosecutorial misconduct by asking inflammatory questions during cross-examination, making unsupported attacks on Kaufman's character during closing statements, and imputing a lack of credibility to Kaufman by inappropriately inserting into evidence that the state's witnesses had left Ohio prior to the commencement of Kaufman's case in chief.

**{¶ 135}** In reviewing the state's alleged misconduct, a court should look at whether the state's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. An appellate court should not find reversible error unless, in the context of the entire proceedings, it appears that the misconduct deprived the appellant of a fair trial. *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136; *State v. Schwab*, 7th Dist. No. 08 MA 78, 2009-Ohio-1312, at ¶25, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶140, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

**{¶ 136}** As his first argument, Kaufman contends that the state asked improper questions during the cross-examination of Tracey and Kaufman in order to imply that

they were bad people. During Tracey's cross-examination, the state asked the following:

{¶ 137} "Q: You understand that [JB] loves you; right?

{¶ 138} "A: Yes.

{¶ 139} "Q: And if he had complained to you about sexual abuse, and you didn't do anything about it, that would make you a pretty bad mother, wouldn't it?

{¶ 140} "A: Yes it would."

{¶ 141} During Kaufman's cross examination, the state asked the following:

{¶ 142} "Q: And if you [committed the offenses charged], that would make you a bad person, wouldn't it?

{¶ 143} * * *

{¶ 144} "A: I would think so.

{¶ 145} * * *

{¶ 146} "Q: A really sick person; right?

{¶ 147} * * *

{¶ 148} "A: Yes."

{¶ 149} Kaufman contends that these two exchanges were only for the purpose of attacking the witness's character. The general scope of the questioning of Tracey was appropriate, given that her direct examination included repeated testimony that JB had not disclosed the abuse to her at any point. However, the form of the questions posed to Tracey and to Kaufman was inappropriate. The state seems to have worded the questions merely to have the witnesses assent to questions with the words "bad mother" and "sick person" in them, even though the hypothetical nature of the questions added nothing to the evidence.

{¶ 150} Kaufman's argument indicates that he is taking issue with these two

questions because of the general impression that the mere utterance of the questions would leave in the jury's mind. However, we cannot conclude that the jury decided that Tracey was a bad mother and that Kaufman was a sick person due to the state's hypothetical questions which elicited obvious answers. While it would have been preferable for the state to have refrained from adding such superfluous questions, the questions did not rise to the level of prejudicial error in the context of the entirety of testimony presented at trial. See, e.g., *State v. Gillard* (1988), 40 Ohio St.3d 226, 230, 533 N.E.2d 272 (noting that the reference to the defendant's nickname as originating from shooting a sleeping woman in the head, while improper, was insignificant compared to the weight of the evidence presented). Within the larger scope of the cross-examinations, the witnesses answered the questions in a way that indicated that they did not share the qualities of the sick or bad people described. Kaufman was not denied a fair trial merely because the state asked the foregoing questions.

{¶ 151} As his second argument, Kaufman contends that the state committed prosecutorial misconduct by stating during closing argument that Kaufman was "a liar, a con artist, and a child molester." Again, Kaufman asserts that the state improperly impugned his character.

{¶ 152} Because the statements were made during the state's closing arguments, "we must keep in mind the latitude counsel is given during closing arguments and that the closing must be viewed in its entirety in determining whether the complained of remarks were prejudicial." *State v. Morris*, 7th Dist. No. 08 CO 7, 2009-Ohio-3326, at ¶133, citing *State v. Byrd* (1987), 32 Ohio St.3d 79, 82, 512 N.E.2d 611; *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. An appellate court must "view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." *State v. Treesh* (2001), 90 Ohio St.3d 460, 466,

739 N.E.2d 749. A conviction should be reversed due to improper statements in closing only if the jury would have found the defendant not guilty but for the improper statements. *State v. Benge* (1996), 75 Ohio St.3d 136, 141, 661 N.E.2d 1019.

{¶ 153} The state has the duty to pursue the convictions of guilty defendants with all appropriate zeal. However, the state's arguments to the jury cannot extend beyond reasonable inferences that can be drawn from the evidence presented. A prosecutor may state his opinion if it is based on the evidence presented at trial. *Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶213. For example, in *State v. Carter*, 7th Dist. No. 05 JE 7, 2007-Ohio-3502, this court noted that a prosecutor may state in closing arguments that the defendant is "someone who kills people," as a conclusion based on the evidence presented during trial that the defendant had killed someone. Id. at ¶47.

{¶ 154} The state presented evidence during trial that Kaufman had manipulated the victims into submitting to his sexual abuse, violating their trust and the trust of the other family members involved in the victims' lives at the time. Although "'a conviction based solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal' * * *, '[r]ealism compels us to recognize that criminal trials cannot be squeezed dry of all feeling.'" *Carter*, at ¶45, quoting *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 490 N.E.2d 906, and *State v. Keenan* (1993), 66 Ohio St.3d 402, 409, 613 N.E.2d 203. Although the state's choice of words could be seen as hyperbolic, the depiction of Kaufman was based on evidence presented at trial and inferences reasonably drawn therefrom. Moreover, any potential error from the statement would have been corrected by the trial court's instructions that the arguments of counsel were not evidence. *Diar* at ¶211, citing *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819. Thus the state's single description of

Kaufman as "a liar, a con artist, and a child molester" in its closing argument was permissible.

{¶ 155} Finally, Kaufman argues that the state committed prosecutorial misconduct by inserting into evidence the fact that all witnesses for the state were gone and could not be called back to provide rebuttal testimony. Kaufman points out that the state further exploited this evidence during closing arguments by implying that Kaufman waited for the witnesses to leave as part of his trial strategy.

{¶ 156} As noted above, the state had some latitude to make broad statements or inferences during its closing argument. However, a prosecutor is not permitted to go beyond the admissible evidence in a trial. *Smith*, 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. The state should avoid insinuations, which are not supported by admissible evidence, which are used to mislead a jury. Id. at 14. In *Smith*, the prosecution stated during closing arguments that the entirety of the defense's evidence was fabricated, and implied that defense counsel had committed perjury by intentionally manufacturing the allegedly false evidence presented. Id. The Ohio Supreme Court found that the prosecutor's misconduct was flagrant and overarching to the point of depriving the defendant of a fair trial. Id.

{¶ 157} Some parallel could be drawn between *Smith* and this case in that the state in this case made an unsupported inference regarding Kaufman's trial strategy in order to undermine his credibility. However, during the state's closing statements, the state appears to be undermining Kaufman's credibility specifically regarding conflicting testimony regarding whether or not Donna's bathroom door could be locked. The state did not make the kind of flagrant overarching comments that were at issue in *Smith*. The testimony regarding the bathroom door was pertinent to whether or not KC was a credible witness, or specifically whether KC's testimony regarding one

particular instance of abuse was credible.

{¶ 158} The state's insinuation was not terribly strong: Kaufman testified that he thought the state's witnesses would still be available at the time of his testimony. Kaufman specifically argued against the state's claim that he "conveniently" waited until the state rested to introduce the fact that the bathroom door did not lock and pointed out that the evidence was in fact discussed before the state rested. The jury found that KC was, overall, credible despite the strong evidence that he was mistaken as to whether Donna's second floor bathroom could be locked. The jury's finding of credibility could have been based on the other consistent and credible testimony offered by KC or perhaps based on the fact that the bathroom door was a relatively small and collateral piece of evidence. It is less likely that the jury would have acquitted Kaufman but for the state's improper but relatively weak statements. Given the entirety of the evidence presented and the context of the state's statements, the state's misconduct did not prejudice Kaufman so as to deprive him of a fair trial.

{¶ 159} In conclusion, counsel for the state did exceed the boundaries of propriety a few times during cross-examination and closing statements. However "[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation." *State v. Maurer* (1984), 15 Ohio St.3d 239, 267, 15 OBR 379, 473 N.E.2d 768, quoting *Dunlop v. United States* (1897), 165 U.S. 487, 498, 17 S.Ct. 375, 41 L.Ed. 799. The few instances of misconduct by the state did not pervade Kaufman's trial to the point that he was denied his due process right to a fair trial. Accordingly, Kaufman's tenth assignment of error is meritless.

**Improper Joinder in Indictment**

{¶ 160}  In his first of ten assignments of error, Kaufman asserts:

{¶ 161}  "The Trial Court Erred by Denying relief from Improper Joinder of the Indictment Thereby Depriving Appellant a Fair Trial in Violation of U.S. CONST. Amend. VI, and XIV; and OHIO CONST. Art. §§1, 9, 10, and 16."

{¶ 162}  Kaufman contends that the trial court abused its discretion in denying his motion for relief from prejudicial joinder.  Kaufman asserts that the trial court should have granted separate trials for each of the two victims in the complaints against him.

{¶ 163}  Crim.R. 8(A) provides that "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."  The law favors joinder because a single trial will conserve time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries.  *State v. Schiebel* (1990), 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54; *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288; *State v. Thomas* (1980), 61 Ohio St.2d 223, 225, 15 O.O.3d 234, 400 N.E.2d 401.

{¶ 164}  However, the interest in joint trials is not unrestricted.  Crim.R. 14 protects parties from prejudicial joinder and states, "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * *, or provide such other relief as justice requires."  Severance may be warranted if the trial court finds a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence.  *United States v. Zafiro*

(1993), 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317.

{¶ 165} "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim* (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661. The first determination, known as the "other acts test," may negate prejudice from joinder if the state could have introduced evidence of one offense in a separate trial of another offense under the other- acts portion of Evid.R. 404(B). *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1. The second determination, known as the "joinder test," only requires a showing that the evidence of each of the joined offenses is simple and direct. Id.

{¶ 166} It is the defendant who bears the burden of affirmatively showing that his rights were prejudiced by joinder. *State v. Clifford* (1999), 135 Ohio App.3d 207, 211, 733 N.E.2d 621, citing *Torres*, 66 Ohio St.2d 340. Absent a clear showing of abuse of discretion, a trial court's decision regarding joinder will not be disturbed. *Torres*; *Clifford*. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 158, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 167} Kaufman argues that neither the other-acts test nor the joinder test was satisfied in this case. Kaufman first argues that the evidence from each victim would be inadmissible as other-acts evidence in separate trials under Evid.R. 404(B) and the rape-shield statute. Kaufman states that the alleged pattern of committing sex offenses against children in a secretive manner is not evidence of a unique modus operandi, but instead simply multiple offenses. The state argues that the evidence would have been

admissible under Evid.R. 404(B) because the offenses were committed with the same modus operandi and showed motive, opportunity, intent, plan, knowledge, and/or absence of mistake or accident.

{¶ 168} During the March 11, 2008 hearing on Kaufman's motion to sever and the state's motion to admit other-acts testimony for unindicted offenses against RT, which the trial court denied, the state's position on both motions was that Kaufman's similar modus operandi with each victim justified the admission of other victims' evidence in all of the charged offenses. Although there was much discussion by counsel regarding the motions, the trial court did not provide reasoning on the record as to why it specifically overruled Kaufman's motion to sever. In the written judgment entry, the trial court stated only that Kaufman failed to demonstrate that he would be prejudiced by the joinder of the offenses and quoted the language of Crim.R. 8(A) that the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Thus, although the state argued in favor of joinder only under the other-acts test, the trial court did not indicate whether it had overruled Kaufman's motion for the same reason.

{¶ 169} Looking first at the "other acts test," we analyze whether evidence from each victim would have been admissible in other trials if they had been severed as requested. We note that "[t]he admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment." *Schaim,* 65 Ohio St.3d at 59, citing *State v. Curry* (1975), 43 Ohio St.2d

66, 68, 72 O.O.2d 37, 330 N.E.2d 720.

{¶ 170} Had there been separate trials for the offenses against the different victims, a request to admit testimony from other victims would need to have survived both Evid.R. 404 and the rape-shield statutes. Evid.R. 404 states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion" and that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404 notes that exceptions apply pursuant to rape and gross sexual imposition statutes. The exception language in both the rape and gross-sexual-imposition statutes, R.C. 2907.02(D) and 2907.05(E) is identical and states:

{¶ 171} "Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

{¶ 172} Because we are looking at the admission of sexual-activity evidence from two different victims that do not involve the origin of semen, pregnancy, or disease, the other-acts evidence must be admissible pursuant to R.C. 2945.59, which states:

{¶ 173} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

{¶ 174} Thus there are only a few limited circumstances under which other-acts involving sexual activity would be admissible in a separate case. The state's objective of showing that Kaufman had committed the offenses with the same pattern would only fall under the "scheme, plan, or system" category of R.C. 2945.59. However, such "pattern" evidence is only relevant in a case under two scenarios:

{¶ 175} The first scenario exists in a case when "the 'other acts' form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. In such cases, it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts. To be admissible pursuant to this sub-category of 'scheme, plan or system' evidence, the 'other acts' testimony must concern events which are inextricably related to the alleged criminal act." *Curry*, 43 Ohio St.2d at 73.

{¶ 176} An example of inextricably related acts might involve overlapping time and place of the offenses against different victims, such as occurred in *In re Hollobaugh*, 7th Dist. No. 08 MA 22, 2009-Ohio-797, at ¶35: "For instance, victim B related that he stood look out for appellant during an assault on victim A, which assault was previously described by victim A. * * * Victim B also disclosed that he and his brother once gave appellant oral sex at the same time." However, when the acts

against separate victims are "chronologically and factually separate occurrences, they are generally not inextricably related." *State v. Smith* (1992), 84 Ohio App.3d 647, 667, 617 N.E.2d 1160, citing *State v. Eubank* (1979), 60 Ohio St.2d 183, 14 O.O.3d 416, 398 N.E.2d 567. In the case at hand, the offenses alleged occurred at temporally distinct times against victims who did not know one another. Neither victim's evidence was necessary for the background or explanation of the other victim's allegations. Thus, the evidence from other victims could not be admitted as other-acts evidence under this first scenario.

{¶ 177} The second scenario exists in a case when the identity of the perpetrator of a crime is at issue. See, e.g., *State v. Coley* (2001), 93 Ohio St.3d 253, 259-260, 754 N.E.2d 1129; *State v. Williams* (1995), 73 Ohio St.3d 153, 157-159, 652 N.E.2d 721. "Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime." *Smith*, at 666. See also *Schaim,* 65 Ohio St.3d at fn. 11. As is often the case in offenses of a sexual nature, whether or not the crime actually occurred is in issue and is thus not open and evident. Here, the identity of the offender is not disputed. Like the facts in *Schaim*, there is no dispute that if the victims were telling the truth, Kaufman was the perpetrator. See *Schaim* at 61. This indicates that witness credibility rather than identity is the material issue in the case. Thus the evidence from other victims should not be admitted as other-acts evidence under this second scenario.

{¶ 178} More importantly, in the same hearing on Kaufman's motion for relief from prejudicial joinder, the trial court denied the state's motion to admit evidence of other acts through the testimony of RT, the victim not included in the original indictment. The state had requested the admission of evidence from the additional victim for the same reason: in order to demonstrate that Kaufman committed additional

offenses in the same manner against the same type of victim.  The trial court noted the extremely prejudicial nature of other-acts evidence during that hearing and during later discussion on the matter at trial.  Given the trial court's decision on a different alleged victim on the same other- acts issue, the trial court could not have denied Kaufman's motion for relief from prejudicial joinder on the same grounds.

**{¶ 179}**  Based on the foregoing, it is clear that joinder was not possible under the other-acts test.  Thus the only way joinder would have been permissible in this case would have been through satisfaction of the broader joinder test.

**{¶ 180}**  The joinder test only requires that the evidence of each joined offense is simple and distinct and ensures that a jury would be capable of segregating the proof required for each offense.  *Schaim* at 62; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, at ¶37; *State v. Mills* (1992), 62 Ohio St.3d 357, 362, 582 N.E.2d 972.

**{¶ 181}**  On this point, Kaufman argues that the evidence was not simple and distinct because the inflammatory nature of the offenses prevented the jury from being able to segregate the evidence as it applied to each victim.  The state counters that the evidence was simple and distinct because the testimony of each victim was separate and uncomplicated.  The state relies primarily on *State v. Bell*, 7th Dist. No. 06 MA 189, 2008-Ohio-3959, and *In re Hollobaugh*, 7th Dist. No. 08 MA 22, 2009-Ohio-797, to support this contention.

**{¶ 182}**  It is true that *Hollobaugh and Bell* survived the "simple and direct evidence" analysis on the joinder issues raised therein.  However, the joinder issue in both of those cases was resolved under a plain-error standard of review due to waiver. Here, Kaufman timely moved for relief from prejudicial joinder and renewed his motion repeatedly during trial in order to preserve the issue for appeal.  Additionally,

*Bell* and *Hollobaugh* are both factually distinguishable.

**{¶ 183}** In *Bell*, the presence of DNA evidence linked the perpetrator to the offenses. *Bell* at ¶21-22. Due to the immediate reporting of the victims and the presence of DNA evidence, the fact of the crimes in *Bell* was open and evident, which indicates that the testimony otherwise may have been admissible pursuant to the second scenario of the other-acts test as described above. In *Hollobaugh*, this court relied on the fact that the case was tried under the Juvenile Rules, and at a bench trial rather than to a jury, in order to conclude that the risk of prejudice from multiple inflammatory accusations was low. *Hollobaugh* at ¶34. This court also pointed out the inextricable nature of the victims' testimony, which indicates that the testimony otherwise may have been admissible pursuant to the first scenario of the other-acts test. Id. at ¶35. Thus, although the factual backgrounds of these two cases may be similar to the one at hand, they do not support a finding of nonprejudicial joinder in this case due to additional factors at play.

**{¶ 184}** Focusing entirely on the simplicity versus complexity of evidence, this case could be appropriate for joinder at first blush. The offenses took place during different time periods, in different places, against different victims. Each victim gave clear testimony as to his allegations, and the testimony offered by one victim did not contradict or overlap with the testimony of the other victim. We have no reason to presume that the jury confused which offenses Kaufman committed against KC and which offenses Kaufman committed against JB.

**{¶ 185}** However, complexity of information is not the only consideration in this analysis. This inquiry at hand "focuses on whether the trier of fact is likely to consider 'evidence of one [offense] as corroborative of the other.'" *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97, quoting *Dunaway v. United States* (C.A.D.C.1953), 205

F.2d 23, 27. The risk of the jury erroneously using one victim's evidence to corroborate the other victim's testimony is not only possible through the confusion of facts, but also through mistakenly presuming that the numerous similarities between unrelated offenses make it more likely that the offenses occurred.

{¶ 186} As stated in *Torres*, "[j]oinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, but it is otherwise when the evidence is direct and uncomplicated *and can reasonably be separated as to each offense*." (Emphasis added.) *Torres*, 66 Ohio St.2d at 343. In *Schaim*, the defendant had been convicted of rape and gross sexual imposition stemming from offenses against his adopted daughter and a younger daughter. *Schaim,* 65 Ohio St.3d at 52. The Ohio Supreme Court rejected the state's argument that the evidence against Schaim was simple and direct enough to avoid prejudice. After pointing out that even the appellate court had confused the testimony of two of the victims, the Ohio Supreme Court concluded that "[g]iven the highly inflammatory nature of the offenses, the similarities between portions of [the victims'] testimony, and the fact that joinder allowed the state to circumvent the prohibition on other acts testimony, we conclude that the defendant was prejudiced by the consolidated trial." Id. at 62-63. Thus, prejudice can occur with offenses which are highly inflammatory in nature and involve similar victim testimony. When such prejudice was demonstrated in *Schaim*, the trial court "abused its discretion in refusing to sever these counts, particularly when its reasons for doing so were based on the fact that committing one of these crimes shows a propensity to commit another – an inference that a jury is forbidden to draw." Id. at 63. Although Kaufman's offenses against victims JB and KC were distinct in terms of time and place, the similarities between the sexual abuses committed against each victim, the inflammatory nature of the offenses, and the weakness of the evidence,

especially in regards to JB, all indicate that the risk of prejudice from joinder in this case was extremely high.

{¶ 187} Because there is an especially high danger that the jury may cumulate the evidence of separate offenses that are jointly tried, "both the trial court and counsel must conduct such a trial with 'vigilant precision in speech and action far beyond that required in the ordinary trial.'" *State v. Garrett*, 12th Dist. No. CA2008-08-075, 2009-Ohio-5442, at ¶49, quoting *Drew v. United States* (C.A.D.C.1964), 331 F.2d 85, 94.

{¶ 188} Such "precision in speech and action" was not conducted here and is most clearly exemplified by the state's following remarks during closing arguments: "There are no eyewitnesses to these types of crimes. They happen in private with the defendant or any other defendant, and the victim. But what you have here is even stronger than if there were eyewitnesses, because you have two independent victims, separate and apart. * * * That is stronger than an eyewitness. *That is independent corroboration.* They both said what happened to them, and *they corroborate each other's stories*, because what happened to one is essentially the mirror image of what happened to the other." (Emphasis added). This statement elucidates the risk of prejudice from erroneously considering the separate evidence of JB and KC cumulatively, especially in light of the weakness of the evidence regarding victim JB. As in *Schaim*, we find that Kaufman was prejudiced by the joinder of multiple victims, given the inflammatory nature of the offenses, the similar victim testimony, and the fact that the state was able to use the "joinder test" as a back door to present an "other acts" and propensity argument.

{¶ 189} Our conclusion is not meant to imply that any offenses of a sexual nature must be severed for fear that a fact-finder will erroneously use the evidence of one crime to corroborate the other. A good example of when multiple sexual offenses

do not call for severance is in this court's recent decision in *State v. Dew*, 7th Dist. No. 08 MA 62, 2009-Ohio-6537. In *Dew*, the defendant requested separate trials for two groups of victims, one group of victims who were minors at the time of the offenses and one group of victims who were adults. Id. at ¶6, 89. The circumstances of Dew's offenses against the two groups of victims, as well as his relationships with the two groups of victims, were rather different: Dew had been a gymnastics coach for the minors, had a great amount of control over their lives, was an authority figure and even a father figure to the victims, and groomed the victims over a number of years. Id. at ¶5-22. As for the adult victims, they received unnecessary and inappropriate chiropractic treatments by Dew. Id. at ¶31-40. There was no indication in *Dew* that each victim's allegation was used in order to argue that the victims' claims independently corroborated one another and, by implication, made it more likely that the offenses occurred. There was further indication that the jury was in fact able to segregate the evidence regarding each victim, as the jury acquitted Dew on a number of counts. Id. at ¶95, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 88, 564 N.E.2d 54.

{¶ 190} When keeping in mind the policies promoted by the rape-shield statute, which must be equally applied to protect both the victims and the defendants, the tendency for a jury to use one victim's testimony to corroborate the other's is too likely given the particular facts presented at Kaufman's trial. Although it may not have been an abuse of discretion for the trial court to initially deny Kaufman's motion for relief from prejudicial joinder, the trial court abused its discretion by summarily denying the motion when Kaufman renewed his motion both after the state's case in chief and at the close of trial. Accordingly, Kaufman's first assignment of error is meritorious.

**Remaining Assignments of Error**

{¶ 191}  In his seventh, eighth and ninth assignments of error, Kaufman asserts:

{¶ 192}  "Appellant Was Denied Due Process, a Fair Trial and the Liberties Secured by the United States Constitution Amend. V & XIV and Ohio Const. Art. I, §§ 10 and 16 When the Trial Court Provided assistance to the State to Insure All Evidence of all Elements had been Presented."

{¶ 193}  "The Trial Court Abused its Discretion in Denying a Request for Continuance When Defense Counsel CanNot Provide Effective Assistance of Counsel and Additional time is Needed to Prepare."

{¶ 194}  "Appellant's Convictions and Sentences Are in Violation of the State and Federal Constitutions Because Appellant Was Denied the Effective Assistance of Counsel.  U.S. CONST., amend. VI and XIV; OHIO CONST., art. I, §§1, 10 and 16."

{¶ 195}  Given our disposition of Kaufman's first assignment of error, Kaufman's seventh, eighth, and ninth assignments of error are moot.

{¶ 196}  In conclusion, Kaufman's assertions regarding sufficiency of the evidence, manifest weight of the evidence, cross-examination, jury instructions, expert testimony, and prosecutorial misconduct are meritless.  However, Kaufman's assertion of prejudicial joinder is well taken and his first assignment of error is meritorious. Kaufman's remaining assignments of error are rendered moot due to the resolution of the first assignment of error.  Accordingly, the judgment of the trial court is reversed and remanded to the trial court for further proceedings.

Judgment accordingly.

DONOFRIO, J., concurs.

VUKOVICH, P.J., dissents.

_____

VUKOVICH, Presiding Judge, dissenting:

{¶ 197} I dissent from the decision to reverse appellant's conviction merely because sexual offenses committed against two child-victims were joined in one trial. I believe that the defendant has not met his burden of establishing prejudice under the "joinder test." As a result, the "other acts" test is irrelevant. *State v. Johnson* (2000), 88 Ohio St.3d 95, 109.

{¶ 198} As the majority points out, joinder is favored in the law. The joinder test is "less stringent" than the "stricter" other-acts test. Id. at 109; *State v. LeMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶50. Thus, policy reasons for the other-acts test should not seep into the application of the joinder test.

{¶ 199} A claim of prejudice can be negated if the evidence of each joined offense is simple and direct. *LeMar*, 95 Ohio St.3d 181 at ¶50, 52. Thus, where the proof of the joined offenses was separate and distinct and the jury was not likely to be confused as to which evidence proved which offense, a trial court does not abuse its discretion in refusing to sever the offenses. *State v. Coley* (2001), 93 Ohio St.3d 253, 260.

{¶ 200} As for references to the strength of the evidence and the relatedness of the offenses, I believe the majority misinterprets the following test:

{¶ 201} "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." *State v. Torres* (1981), 66 Ohio St.2d 340, 343-344.

{¶ 202} This statement clearly means that if the second part of this sentence is satisfied, there is no prejudice regardless of the first part. Here, the evidence was

direct and uncomplicated and could be reasonably and readily separated as to each offense. See *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶34. As the majority acknowledges, the offenses against each of the two victims were separated in time and place. Each victim testified as to their various allegations against appellant. There was no apparent confusion as to which acts were committed against which victim. The evidence was simple.

{¶ 203} In any event, I would not characterize the evidence as "very weak." See *Torres*, 66 Ohio St.2d at 343-344. The trial court, whose discretion is being evaluated here, heard and viewed the witnesses as they testified; this court did not. Furthermore, the offenses are not unrelated as they involved the sexual abuse of two young male children by a person in a position of authority.

{¶ 204} Nor do I agree that the "inflammatory" nature of the allegations require severance. In *Johnson*, the Supreme Court had no problem with joinder of a kidnapping/robbery victim with a *death-penalty* aggravated murder that occurred two months apart, focusing on the simplicity and directness of the evidence and the fact that it was unlikely that the jury confused the evidence proving the separate charges. *Johnson*, 88 Ohio St.3d at 110. Cf. *State v. Schaim* (1992), 65 Ohio St.3d 51, 63 (finding that jury was not capable of segregating very similar evidence because even the three appellate judges could not keep the facts of each victim straight). Finally, this court recently upheld joinder where minor gymnast victims and adult chiropractic victims were joined for one trial where all allegations were sexual in nature. *State v. Dew*, 7th Dist. No. 08MA62, 2009-Ohio-6537, ¶95-96.

{¶ 205} Accordingly, I would overrule appellant's first assignment of error dealing with joinder. I would then overrule all other assignments of error (including numbers seven through nine, which the majority found to be moot) and uphold

appellant's convictions.