[Cite as *State v. Carter*, 2022-Ohio-3855.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                      Court of Appeals No. OT-21-023

      Appellee                              Trial Court No. 19CR259

v.

James Carter, Deceased,                   **DECISION AND JUDGMENT**
Brett A. Klimkowsky,
Substituted As Appointed                  Decided:  October 28, 2022
Personal Representative of
Decedent

      Appellant

* * * * *

James VanEerten, Ottawa County Prosecuting Attorney,
Barbara Gallé Rivas, and Thomas A. Matuszak, Assistant
Prosecuting Attorneys, for appellee.

Brett A. Klimkowsky, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, James E. Carter, appeals the judgment of the Ottawa County

Court of Common Pleas, following a jury trial, which convicted him of two counts of

rape and one count of disseminating matter harmful to juveniles. For the reasons that follow, we affirm.[1]

## I. Facts and Procedural Background

{¶ 2} On December 5, 2019, the Ottawa County Grand Jury returned a three-count indictment against appellant, charging him with two counts of rape of a child less than ten years of age in violation of R.C. 2907.02(A)(1)(b), and one count of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(1), a felony of the fourth degree.

{¶ 3} The allegations were that in the spring and summer of 2006 and 2007, appellant engaged in numerous sexual acts with the victim, A.B. A.B., who was approximately eight years old at the time, knew appellant as her mother's stepfather.

{¶ 4} Prior to trial, numerous motions were filed. Relevant here, on October 12, 2020, the state filed two motions in limine. The first motion sought to apply the rape shield statute, R.C. 2907.02(D), to preclude appellant from asking any questions concerning other sexual activity involving A.B. The second motion sought to permit the state to call a licensed professional clinical counselor, Mindy Koskela, as a witness to testify regarding the emotional, psychological, and physical side effects of child victims of sexual abuse. Appellant did not file any briefs in opposition to these motions.

---

[1] Appellant died while this appeal was pending. Upon the motion of the state, we have appointed appellant's attorney of record, Brett Klimkowsky, as appellant's personal representative in accordance with App.R. 29(A).

2.

{¶ 5} On January 14, 2021, the trial court held a hearing on the state's motions in limine. The first motion concerned potential sexual activity that A.B. may have had with her brother around the same time as appellant's activity, and which appellant wanted to use as an alternative explanation for the behavior being exhibited by A.B. at that time. The trial court found that appellant's proposed use of the evidence did not fall within any of the exceptions enumerated in R.C. 2907.02(D), and therefore granted the state's first motion in limine.

{¶ 6} As to the second motion, the state was seeking a ruling to allow Koskela to testify as a fact witness because she was unable to testify as an expert witness due to the state's failure to provide her written report and summary of qualifications to the defense more than 21 days before trial as provided under Crim.R. 16(K). However, because the trial date had been continued, the state was now able to meet the 21-day deadline, and the trial court ruled that Koskela was allowed to testify as an expert witness.

{¶ 7} Also relevant here, prior to trial the state filed an additional motion in limine to allow A.B. to testify with a trained comfort dog. Appellant did not oppose the motion, and it was granted by the trial court.

{¶ 8} Ultimately, the matter proceeded to a three-day jury trial beginning on May 18, 2021. At the trial, the following evidence was presented.

{¶ 9} A.B. was born in 1998. A.B. testified that as a young child, she had a good relationship with appellant. Appellant would play games with her, take her and her brothers to get ice cream, compliment her, and buy her gifts.

{¶ 10} However, A.B. testified that when she was approximately five to six years old, appellant started showing her pictures of newspaper ads for bras and underwear, and that he would rub on the picture of the woman's breast or the man's underwear.

{¶ 11} In the summer before A.B. began kindergarten, appellant and his wife, L.C. moved down the street from A.B. Because A.B.'s mother worked, L.C. or appellant would help get A.B. and her brothers off to school. A.B. testified that her older brother's bus left approximately 30 minutes before hers. During that 30-minute window, A.B. testified that she was often home alone with appellant. A.B. testified that while she was sitting on the couch watching television, appellant would sit next to her and would put his hands in her pants and start "fingering" her. Specifically, A.B. explained that appellant put his fingers on her labia and clitoris, but he did not place them in her vagina. A.B. testified that this conduct would last for 15 to 20 minutes until her bus arrived. A.B. further testified that this behavior occurred almost every time that he got her onto the bus. A.B. explained that appellant would tell her that it was a normal thing to do. A.B. also described that a few times appellant would rub his penis through his pants while he was touching her.

4.

**{¶ 12}** A.B. testified that appellant's conduct changed how she felt about sex, and that in first grade, she would touch herself in school because she was "craving" the touch. A.B.'s first grade teacher, Ms. Jimerson, gave her a stress ball to help control the behavior so that A.B. could focus on school.

**{¶ 13}** A.B. next testified to an incident that occurred in the early summer of 2006. A.B. described that she was at a babysitter's house when she fell and hit her head on concrete. A.B. testified that she blacked out, and the babysitter called A.B.'s mother, who had appellant and L.C. come pick her up. On the way back to appellant's house, A.B. threw up in the car. Appellant had L.C. clean the car, while he took A.B. up to the bathroom to give her a shower. A.B. testified that while appellant was helping her to get clean in the shower, he began rubbing her clitoris and labia as he had done in the mornings before school. A.B. testified that while he was doing this, appellant was looking out of the bathroom window to see where L.C. was.

**{¶ 14}** A.B. testified that appellant continued fingering her at various times when no one else was home during the period between August 2006 and May 2007. On one occasion, in the spring of 2007, appellant had A.B. follow him into his bedroom. Appellant then went into the closet and pulled out a shoe box full of pornographic videos. Appellant selected a video and played it for A.B., instructing her not to tell anyone that she saw it. During the ten or fifteen minute video, appellant unbuttoned A.B.'s pants and started fingering her again. Appellant also unbuttoned his own pants and started

5.

masturbating. Appellant told A.B. that he wanted her to be like the people in the pornographic video when she got older.

{¶ 15} A.B. next testified to an event that occurred in 2012. A.B. testified that she was alone with appellant at his house, and was sitting on the couch, when appellant approached and started playing pornography on his laptop. Appellant asked A.B. what pornography sites she visited, and A.B. replied with the website that she used. Appellant then told her to go to a different website because it had better videos. As this was going on, appellant unbuttoned A.B.'s pants and fingered her, which then escalated to him performing oral sex on her. A.B. testified appellant stopped when he heard a car door and L.C. returned home.

{¶ 16} Also in 2012, A.B. testified that one time in July or September, appellant pulled out his penis and started masturbating. Appellant then told A.B. to grab his penis and start "jacking him off." A.B. complied and appellant ejaculated, which caused A.B. to "freak out." Appellant responded, "Don't worry, it will be fine. Don't worry, that is how babies were made." A.B. testified that around this time, she started to learn that something was wrong with what was happening.

{¶ 17} In May or July 2013, A.B. spent the night at appellant's home. A.B. testified that she woke up to a heavy presence on her, and discovered that appellant was laying naked on top of her. A.B. pushed appellant off of her, and went into the living room. Appellant followed her. When A.B. asked what appellant was trying to do,

6.

appellant replied, "I was trying to have sex with you." A.B. then sat in a chair in the corner and tried to watch television. She testified that appellant was standing to the left of her and was waiving his penis in front of her face. A.B. testified that she ignored appellant and focused on the television, which prompted appellant to say, "Well, I guess you don't want to do anything."

{¶ 18} A.B. testified that around the same time, appellant told her that when she turned 18 or 19 years old, he wanted to have a child with her.

{¶ 19} A.B. testified that she was approximately 18 years old when she finally disclosed the abuse to her brother, and then her counselor. A.B. explained that appellant had told her not to tell anyone because they could get into trouble. A.B. also thought that no one would believe her because she was a kid through all of it. Right after she told her counselor, A.B. reported the abuse to the police.

{¶ 20} Finally, A.B. testified to an incident that occurred when she was in her early teens, when she made a false accusation of rape to the police. A.B. explained that she was with her friend, and her friend wanted to meet up with a man in the woods to have sex with him. Despite A.B.'s warnings not to do it, the friend proceeded to have sex with the man. The friend then got scared that the man was going to turn her in, so she ran into her house and told her mom that the man raped A.B. The friend's mom asked A.B. if that was true, and A.B. replied that it was. A.B. then spoke with Detective Aaron Leist of the Lake Township Police Department, and told him that she was raped and that her

7.

friend was trying to pull the man off of her. A.B. then went to the hospital for an examination. The next day, A.B. had a panic attack because she knew she had lied about the rape allegation. A.B. contacted Detective Leist and confessed to the truth of what happened. A.B. also apologized to the hospital.

{¶ 21} Through the incident of the false rape allegation, A.B. developed a relationship with Detective Leist, such that she sought him out to report the abuse from appellant. Incidentally, Leist later took a job with the Ottawa County Sheriff's Department, where he was assigned A.B.'s case.

{¶ 22} The next witness to testify was Angela Jimerson, A.B.'s first grade teacher. Jimerson testified that she recalled A.B. sitting in an unusual position, which she described as "flying." A.B. would sit on the edge of her chair and have her feet out behind her, and she would almost be rocking. Jimerson believed that A.B. was getting some enjoyment from doing that. Jimerson spoke with her principal and A.B.'s parents, and they decided to manage the behavior by giving A.B. a ball to squeeze to redirect her focus. Jimerson testified that no one made an allegation of sexual abuse to her at that time.

{¶ 23} Thereafter, A.B.'s mother, L.R. testified. L.R. testified that she, A.B., and "Tony"—L.R.'s middle child and the younger of A.B.'s two older brothers—moved in with appellant and L.C. in early 2006. L.R.'s oldest child, "Aaron," was living with his father at the time. L.R. testified that she began to notice a difference in A.B.'s behavior

8.

around when A.B. was ten or eleven years old. L.R. recounted one time when she walked into A.B.'s room while A.B. was asleep, and found that A.B.'s pants were down and she had been "humping" a teddy bear. When A.B. became a teenager, L.R. noticed that she no longer wanted to hug appellant goodbye anymore.

{¶ 24} L.R. testified that A.B. disclosed the abuse to her when A.B. was around 19 years old. According to L.R., when she confronted appellant about the allegations, appellant denied that he ever abused A.B., and tried to bring up other explanations for the allegations, such as what A.B. learned in health class.

{¶ 25} The next witness to testify was Mindy Koskela, a licensed professional clinical counselor, who was qualified as an expert witness on the subjects of sexual abuse and trauma. Koskela testified that there are a number of signs and symptoms of sexual abuse, which can vary based on the child's age. One example given was that the child acts out by playing sexually with his or her toys, or by humping the furniture. Another example was that sometimes the child can withhold affection from adults. On the other hand, sometimes the child can become overly affectionate and give hugs to strangers.

{¶ 26} Koskela also described the process of grooming, whereby a person provides gifts or affection to a child so that the child feels close to the person and would not be surprised if the affection becomes sexual. Koskela testified that grooming can sometimes lead to delayed reporting of the abuse, particularly where the offender is a close family member.

9.

**{¶ 27}** Notably, Koskela testified that she has not met A.B., nor has she reviewed any reports or material concerning A.B.

**{¶ 28}** Appellant's niece, N.K., testified next. Over appellant's objection, N.K. testified that around 2003 or 2004, when she was 13 or 14 years old, appellant attempted to kiss her at a family cookout. N.K. had gone into the house, and was alone in a small bedroom when appellant approached. N.K. backed up into the corner of the room, but appellant advanced and tried to grab her face and kiss her. N.K. testified that she pushed appellant off of her and ran back outside.

**{¶ 29}** Detective Aaron Leist testified next. Leist testified that he first met A.B. in 2013 when she reported that she was sexually assaulted by a man in the woods near her home. Leist interviewed A.B. at the hospital, and he testified that he quickly determined that she was not being truthful. A.B. confessed to fabricating the story, after which Leist noticed a difference in her demeanor, as if the weight of the world had been lifted off of her shoulders. According to Leist, A.B. ultimately was charged and punished for her initial false report.

**{¶ 30}** Leist testified that he again encountered A.B. in June 2018 when she arrived at the Lake Township Police Department to report the sexual assault allegations against appellant. Leist observed that A.B.'s demeanor was similar to when she had "come clean" and confessed to fabricating the allegations in 2013. Because the alleged

10.

crime did not occur in Lake Township's jurisdiction, Leist referred the matter to the Ottawa County Sheriff's Department.

{¶ 31} In the summer of 2019, Leist took a position with the Ottawa County Sheriff's Department, and was assigned A.B.'s case. Leist testified that throughout his investigation, the core facts of A.B.'s allegations have remained entirely consistent. Furthermore, Leist testified that he was able to corroborate certain historical facts, such as appellant's residences during the relevant time periods, and A.B.'s treatment for a head injury in the summer of 2006.

{¶ 32} Following Leist's testimony, the state rested. Appellant moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Thereafter, the defense called appellant to testify.

{¶ 33} Appellant, who was 80 years old at the time of the trial, testified that at some point, L.R. and A.B. came to live with him because L.R. was having domestic troubles. Around that same time, appellant had triple bypass heart surgery. Appellant testified that while A.B. was living with him he generally did not have much responsibility for the children.

{¶ 34} Regarding the specific allegations, appellant testified that he rarely put A.B. onto the bus; that it was maybe once a month or so. Appellant denied ever doing anything to A.B., and found her claims to be "shocking." As to the incident following A.B.'s head injury, appellant did not have a clear recollection, but believes that after A.B.

11.

vomited in the car, he took her into the house and washed her face and cleaned her up, but he denied giving her a shower on that, or any other, occasion.

{¶ 35} Appellant was then asked if he ever viewed pornography. Appellant admitted that he had seen pornography in the past, but that all of his pornographic tapes were destroyed when he met his current wife, L.C., and that he had not watched pornography since before A.B. was born. Appellant further denied ever watching pornography with A.B., and testified that he did not even know how to operate a laptop or smart phone.

{¶ 36} Finally, appellant strenuously denied ever performing oral sex on A.B., or digitally penetrating her. Appellant also denied N.K.'s allegation that he tried to kiss her.

{¶ 37} Following appellant's testimony, three of his daughters and step-daughters testified concerning his reputation in the community for being honest and truthful.

{¶ 38} The last witness to testify was appellant's wife, L.C. L.C. testified that when L.R. and A.B. moved in with her, L.C. was working third shift and would get off of work around 6:00 in the morning. She stated that she would then go home and get L.R.'s kids onto the bus. It was only approximately once a month when she had a meeting after work that appellant would get A.B. onto the bus.

{¶ 39} Regarding the incident involving A.B. suffering a head injury and vomiting in the car, L.C. testified appellant did not give A.B. a shower, and that he has never given

12.

any of the grandkids a shower. L.C. testified that the only thing she noticed was that A.B.'s shirt was wet from where appellant washed the vomit off of it.

{¶ 40} L.C. also testified that early in her marriage to appellant, he had some pornography tapes, but then he destroyed those tapes. L.C. did not see appellant destroy the tapes, but she never found them again in her house.

{¶ 41} Finally, L.C. testified that there were very few times where appellant was ever home alone with A.B.

{¶ 42} After L.C.'s testimony, the defense rested. The trial court then instructed the jury and the parties made their closing arguments. Following deliberations, the jury returned with a verdict of guilty as to all counts. At sentencing, the trial court ordered appellant to serve a term of life in prison.

## II. Assignments of Error

{¶ 43} Appellant has timely appealed his judgment of conviction, and now asserts three assignments of error for our review:

1. Appellant's right to effective assistance of counsel pursuant to the Sixth Amendment to the United States Constitution was violated because appellant's court-appointed trial attorney was ineffective.

2. Appellant's right to confront witnesses pursuant to the Sixth Amendment to the United States Constitution was violated because the trial

13.

court prohibited appellant from questioning the alleged victim about her previous allegations of rape by a third-party.

3. The trial court committed reversible error by permitting an alleged expert witness to testify despite said expert not having reviewed the facts of the controversy.

### III. Analysis

### A. Ineffective Assistance

{¶ 44} In his first assignment of error, appellant argues that his trial counsel was ineffective. To prove a claim of ineffective assistance, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Id.* at 697.

{¶ 45} In support, appellant identifies four instances in which he argues his trial counsel was ineffective: (1) trial counsel inappropriately suggested that appellant bore the burden of proving his innocence; (2) trial counsel failed to object to the prosecutor's "inflammatory, prejudicial, and improper" closing statement to the jury that if they returned a not guilty verdict, they would be sending the message to the victim that they

did not believe her; (3) trial counsel failed to provide written responses to the state's pretrial motions in limine and to allow A.B. to testify with the aid of a trained comfort dog; and (4) trial counsel failed to utilize a psychologist to assess appellant for a diagnosis of pedophilia. We find that in each instance, appellant has failed to demonstrate sufficient prejudice.

{¶ 46} As to the first instance, during closing arguments trial counsel made the following statement in the context of the length of time between the act and the prosecution:

> It does present [appellant] with a problem here. We have dates here, a range of dates dating back to 2006. That is, you know, 15 years, and I don't know, I probably could go back to some of the calendars and some of the dates in 2006 and figure out where I had to be, but mostly that is pretty tough for him to be able to defend himself on whether he was working, moving a piano, what he was doing on those days. It is very hard to do.
>
> This is something that you have got to consider. This is a really tough burden on him. The idea of this is to try and prove a negative.

{¶ 47} On appeal, appellant argues that trial counsel's statements suggested to the jury that he bore the burden to prove his innocence rather than the state bearing the burden to prove his guilt. However, given the context of counsel's statement, we disagree with appellant's characterization and do not find that counsel suggested that the

state did not bear the burden of proving his guilt. Furthermore, we note that a few moments earlier, the jury was correctly instructed by the court:

> Before the Defendant can be found guilty of any offense charged in the indictment, it is incumbent upon the State of Ohio to prove each and every essential element of the offense charged.

> It is not the defendant's burden to prove himself innocent as under our system of jurisprudence, the Defendant is presumed innocent until proven guilty beyond a reasonable doubt.

> The presumption of innocence is no mere formality that you may or may not indulge in as a juror, but is an inherent right of each Defendant, and I charge that each and every one of you, as jurors, must give the Defendant the benefit of his presumption of innocence.

> Also, as previously instructed, the Defendant cannot be convicted of the offense unless the State of Ohio has proven each and every essential element of the offense beyond a reasonable doubt.

Therefore, we hold that appellant has not demonstrated a reasonable probability that the outcome of the proceedings would have been different had trial counsel not made the comments regarding trying to prove a negative.

{¶ 48} As to the second instance, the prosecuting attorney stated at the end of closing arguments:

16.

Now [A.B.] told you that first and foremost she was afraid to come forward because she didn't think anybody would believe her.

So when you go back to the jury room, I want you to consider something. If you come back with not guilty verdicts on these charges, what message will [A.B.] get? That you didn't believe her. And she will remember that message for the rest of her life.

But by the same token, if you come back with the right verdicts, the guilty verdicts, what message is she going to get? That you believed her. And she will remember that, too, for the rest of her life.

Now you have all of the evidence and you have more than enough. You know what you need to do.

{¶ 49} Appellant argues that trial counsel should have objected to the prosecuting attorney's closing statements. We agree that the prosecuting attorney's statements were objectionable, be we nonetheless find that counsel's failure to object did not lead to a reasonable probability that the result of the proceedings would have otherwise been different.

{¶ 50} When evaluating a prosecutor's statements in closing argument, we recognize that "the prosecution is entitled to some latitude and freedom of expression." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167, citing *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993). Further, "'[r]ealism compels

17.

us to recognize that criminal trials cannot be squeezed dry of all feeling.'" *Id.*, quoting *Keenan* at 409. However, in this case, we find that the prosecutor improperly and gratuitously "substituted emotion for reasoned advocacy." *Keenan* at 407. Contrary to the state's argument on appeal, the prosecutor was not simply recounting the testimony of Koskela and Leist that many victims of child sexual abuse fail to report out of fear that no one will believe them. Instead, the prosecutor was suggesting to the jury that if they did not return a guilty verdict, then they would validate the fear that caused her to not come forward in the beginning, and she would carry that rejection with her for the rest of her life. We find this tactic to be inflammatory and wrong, and contrary to the role of a prosecutor to ensure

> not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

{¶ 51} Nevertheless, "[t]he fact that the prosecutor engaged in some improper argument * * * does not warrant reversal unless the remarks prejudicially affected

18.

substantial rights of the accused." *LaMar* at ¶ 168. "In making this determination, we must consider the effect of any misconduct in the context of the entire trial." *Id.* "We must also view the prosecutor's closing argument in its entirety when determining prejudice." *Id.*, citing *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996). In this case, we find that the prosecutor's statements—while placed at the end for maximum effect—were not pervasive throughout his closing argument and did not rise to the level of tainting the fairness of the trial. Therefore, we hold that appellant has not demonstrated sufficient prejudice on this claim of ineffective assistance of counsel.

{¶ 52} Turning to the third instance, we again find that appellant has not demonstrated a reasonable probability that the result of the proceedings would have been different had trial counsel filed written responses to the state's motion in limine and motion to allow A.B. to testify with the assistance of a trained comfort dog. Notably, although trial counsel did not file a written response to the state's motion in limine, counsel did oppose the motion and provide arguments against it at the subsequent hearing on the motion, which suggests that counsel's conduct did not fall below an objective standard of reasonableness. Furthermore, appellant has not demonstrated prejudice in that he does not even attempt to argue on appeal that the motions should not have been granted or that they would not have been granted had counsel filed a written opposition. Therefore, we hold that this claim of ineffective assistance must fail.

19.

{¶ 53} Likewise, appellant's fourth claimed instance of ineffective assistance must fail because appellant has not demonstrated sufficient prejudice. Appellant argues that trial counsel was ineffective for failing to secure the services of a psychologist to presumably confirm that he is not a pedophile. However, "[a] decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 118. In addition, appellant's claim is purely speculative as appellant does not identify— and the record does not contain evidence of—any expert witnesses who would have testified that appellant was or was not a pedophile. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66 (Claim of ineffective assistance for failing to use an expert witness is speculative and must fail where defendant "fails to identify the expert witnesses who should have been called or what they would have said."). Therefore, we hold that this claim of ineffective assistance is not meritorious.

{¶ 54} Accordingly, because appellant has not demonstrated that a reasonable probability exists that but for counsel's alleged errors the results of the proceeding would have been different, appellant's first assignment of error asserting ineffective assistance of counsel is not well-taken.

### B. Right to Confront Witnesses

{¶ 55} In his second assignment of error, appellant argues that his Sixth Amendment right to confront witnesses was violated when the trial court prohibited him

20.

from questioning A.B. regarding her accusations that her oldest brother had raped her. Appellant asserts that "AB has a history of accusing people of rape," and "[b]y prohibiting Appellant from cross-examining AB about AB's other false rape accusations against AB's brother, Appellant was unable to meaningfully confront Appellant's accuser and thus Appellant's rights under the Confrontation Clause were violated for the instant case." Appellant additionally asserts that "AB has shown a history of being motivated to lie to people about AB being raped by people, and the jury should have heard about how AB made such an accusation against AB's own brother." Finally, appellant argues that "Appellant did not seek to introduce into evidence past sexual activity occurring between AB and AB's brother. Rather, Appellant sought to introduce into evidence AB's allegation that AB was raped by AB's brother, and this would have been used to show that AB (1) is apparently motivated to lie to people that AB had been raped and (2) AB's accusations against Appellant are not trustworthy because of AB's history of crying wolf about being raped."

{¶ 56} In this case, the trial court prohibited appellant from questioning A.B. about any sexual activity with her brother pursuant to Ohio's rape shield law, R.C. 2907.02(D). R.C. 2907.02(D) provides,

> Evidence of specific instances of the victim's sexual activity, opinion
> evidence of the victim's sexual activity, and reputation evidence of the
> victim's sexual activity shall not be admitted under this section unless it

21.

involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

{¶ 57} Appellant argues that the application of R.C. 2907.02(D) in this case violated his constitutional rights. "It is an established constitutional principle that '(t)he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.'" *State v. Gardner*, 59 Ohio St.2d 14, 16-17, 391 N.E.2d 337 (1979), quoting *Chambers v. Mississippi*, 410 U.S. 284, 294-295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

{¶ 58} "In determining whether R.C. 2907.02(D) was unconstitutionally applied in this instance, we must thus balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *Id.* at 17. The state interests advanced by the rape shield law have been identified as:

First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only

marginally probative, the statute is intended to aid in the truth-finding

process.

*Id.* at 17-18. On the other side of the scale, "[t]he key to assessing the probative value of

the excluded evidence is its relevancy to the matters as proof of which it is offered." *Id.*

at 18.

{¶ 59} At the outset, we note that appellant's characterization that A.B. falsely

accused her brother of rape finds no support in the record. To the contrary, at the June

30, 2020 pretrial hearing, A.B. testified that she accused her oldest brother of rape based

upon events that occurred contemporaneously with the alleged abuse by appellant, but

that she never made any *false* accusations against her brother. More specifically, she

testified that she agreed to take a polygraph test regarding the allegations, which she

passed. A.B. also testified that her oldest brother took a polygraph test about the

allegations and he failed.[2] Furthermore, throughout the subsequent proceedings it

appeared to be settled between the parties that the alleged abuse by her oldest brother did,

in fact, occur.

{¶ 60} Thus, we are not confronted with a situation where appellant sought to

question A.B. regarding false allegations where no sexual activity occurred, which would

not be covered by the rape shield law. *See State v. Boggs*, 63 Ohio St.3d 418, 421, 588

N.E.2d 813 (1992) ("False accusations, where no sexual activity is involved, do not fall

---

[2] At the time of the hearing, no charges had been filed against A.B.'s oldest brother.

23.

within the rape shield statute."). Instead, the issue we must resolve is whether appellant's interest in questioning A.B. about her allegations against her brother for the purpose of attacking her credibility outweighs the state's interest that is protected by the rape shield statute. Because we find that the probative value of appellant's proposed questioning is minimal regarding A.B.'s propensity to make false allegations of rape, we hold that the balancing test favors application of the rape shield law in this case.

{¶ 61} We find several cases from the Ohio Supreme Court to be instructive. In *Gardner*, the Ohio Supreme Court determined that the defendants' constitutional rights were not violated when the court prohibited the defendants from soliciting testimony that the victim was a prostitute. *Gardner*, 59 Ohio St.2d at 19, 391 N.E.2d 337. The defendants were charged with kidnapping the victim and forcing her to submit to oral sex in the backseat of a car at gunpoint. *Id.* at 14. One of the defendants argued at trial that the victim consented to oral sex. On appeal, the defendant argued that the victim's reputation as a prostitute was relevant to the issue of consent, and thus should have been permitted to be testified to at trial. The Supreme Court rejected the reasoning that "prior unchastity with other individuals indicates a likelihood of consent to the act in question," commenting that "[w]hile this premise may have had some validity in an earlier time, it seems quite unpersuasive in today's era of more fluid morals." *Id.* at 18. Ultimately, the court held, "Evidence that complainant had a reputation as a prostitute is not sufficiently probative of consent to outweigh the state's legitimate interests in excluding the

24.

testimony, at least where there is no suggestion in the record that financial arrangements were entered into for sexual activities." *Id.*

{¶ 62} The Ohio Supreme Court addressed the issue again in *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983), and held that application of the rape shield law did not violate the defendant's constitutional rights. In that case, the defendant sought testimony concerning when the victim last had sexual activity prior to the alleged attack. *Id.* at 164. The defendant argued that the testimony would show that the victim had provided conflicting dates, which would call into question her credibility regarding the current allegations. *Id.* In rejecting the defendant's argument, the court found his proposed line of inquiry to be only tenuously connected to the key facts of the case. Thus, the Ohio Supreme Court held, "R.C. 2907.02(D) will render inadmissible evidence of the rape victim's sexual activity with one other than the accused where the evidence: does not involve the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender; is offered simply to impeach the credibility of the victim; and is not material to a fact at issue in the case." *Id.* at 165.

{¶ 63} Several years later, the Ohio Supreme Court revisited the issue in *State v. Williams*, 21 Ohio St.3d 33, 487 N.E.2d 560 (1986), this time finding that the defendant's constitutional rights were violated by the application of the rape shield law. In *Williams*, the defendant was accused of raping a woman after she refused to pay money on a claimed debt. The defendant admitted to having sexual intercourse with the woman, but

25.

claimed that it was consensual.  *Id.* at 33.  The defendant also testified that he had numerous sexual encounters with the victim, that the victim was a prostitute, and that he was her "pimp."  *Id.*  At a pretrial hearing, the trial court ruled that evidence as to the victim's alleged reputation in the community as a prostitute would be inadmissible.  *Id.* However, at the trial, on direct examination, the victim testified that she had never had sex with the defendant prior to the alleged attack, explaining that she did not have sex with men because she was "gay."  *Id.*  The defendant then unsuccessfully attempted to introduce evidence regarding his previous sexual relations with the victim, as well as the testimony of two other people regarding their prior sexual activity with the victim and her reputation as a prostitute.  *Id.* at 33-34.

{¶ 64} In affirming the court of appeals' decision to reverse the defendant's conviction, the Ohio Supreme Court found the case to be distinguishable from that in *Gardner* and *Ferguson*.  The court reasoned that the contested issue was consent, "which directly relates to an element of the crime of rape," and the proffered evidence directly refutes the victim's testimony that she "never" consents to sex with men.  *Id.* at 36.  The court held that while the victim's credibility was being impeached, "the proffered evidence has a more important purpose, which is to negate the implied establishment of an element of the crime charged."  *Id.*  Thus, the court concluded that "the probative value of the testimony outweighs any interest the state has in exclusion."  *Id.*

26.

{¶ 65} Similar to the Ohio Supreme Court, this court has also examined the issue on several occasions. For example, in *State v. Ulis*, 6th Dist. Lucas No. L-93-247, 1994 WL 385196 (July 22, 1994), this court held that the state's interests advanced by R.C. 2907.02(D) outweighed the defendant's interest in the probative value of the evidence. In that case, the defendant was accused of sexually abusing his 12-year-old stepdaughter. *Id.* at *1. The medical doctor who examined the victim testified that the victim's hymen was damaged in a manner consistent with attempted penile penetration. *Id.* At trial, the defendant attempted to introduce testimony that (1) the victim "was very close to men in general and that she was unusually affectionate toward them and outwardly expressed, unusually expressed affection toward them;" (2) a neighboring boy "was always trying to mess with [the complainant] sexually;" (3) the victim would "hang out on the street with the fast girls;" and (4) the victim was caught "in the closet in some state of undress with another boy." *Id.* The trial court sustained the state's objection to the defendant's proffered testimony, and on appeal this court affirmed. This court held, "This testimony is clearly aimed at attacking credibility and reputation. It does not address the origin of semen, pregnancy, or disease or the victim's past sexual activity with the offender. Further, the testimony is not indicative of an alternative source of injury to the complainant's hymen, as suggested by [the defendant]." *Id.* at *4. Thus, this court held that the trial court properly excluded the testimony. *Id.*

27.

{¶ 66} In contrast, in *State v. Ector*, 6th Dist. Lucas No. L-07-1169, 2009-Ohio-515, this court held the defendant's constitutional right to confront witnesses was violated when the trial court prevented the defendant from introducing medical records from the victim's trip to a clinic that occurred around the same time as the alleged sexual conduct. The defendant sought to introduce the medical records because he believed they provided a motive for the victim to fabricate a story implicating the defendant. *Id.* at ¶ 11. According to the defendant, the victim attempted to conceal her visit to the clinic by giving an aunt's address and a grandmother's telephone number for contact. *Id.* On appeal, this court acknowledged that it was arguable that the victim was attempting to conceal her trip to the clinic from her mother. *Id.* at ¶ 26. This court also noted that at least one of the victim's responses on the clinic admission questionnaire was in direct conflict with her statements to police and her trial testimony on an issue that is an element of the offenses. *Id.* This court concluded that the material contained in the excluded evidence presented facts that could show that the victim had a motive to divert attention from her own acts to that of another, and as such the evidence was "highly relevant and [went] to a material issue critical to the state's proof." *Id.* at 27. Thus, this court held that the probative value of the evidence outweighed the state's interest in its exclusion. *Id.*

{¶ 67} In this case, as stated in appellant's brief, the purpose of questioning A.B. regarding her allegations of rape against her oldest brother was to challenge her

credibility. However, the probative value of the proposed questioning is minimally beneficial to appellant due to the likely and accepted reality that A.B.'s allegations against her brother were not false. Indeed, we find that allowing this line of questioning on these grounds would be detrimental, not beneficial, to appellant's case in that it would tend to show that A.B. credibly accused her brother of rape, and thus was more likely to be credibly accusing appellant of rape also.[3] Therefore, we hold that the probative value of the proposed evidence does not outweigh the state's interest in excluding the same, and consequently the trial court did not violate appellant's constitutional right to confront witnesses when it prohibited appellant from questioning A.B. about her allegations of rape against her brother.

{¶ 68} Accordingly, appellant's second assignment of error is not well-taken.

### C. Expert Witness

{¶ 69} Finally, in his third assignment of error, appellant argues that the trial court erred when it allowed Koskela to testify as an expert witness even though she never met A.B. and did not have any specific insight into the details of the case.

{¶ 70} "Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16. An abuse of discretion connotes

---

[3] This is perhaps why appellant's trial counsel initially objected to A.B.'s testimony at the June 30, 2020 hearing that she took and passed a lie detector test regarding the allegations against her brother.

29.

that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 71} In this case, Koskela testified generally to the behaviors and responses of child sexual assault victims, as well as to the process and characteristics of "grooming." Koskela did not offer any testimony regarding whether A.B., specifically, was sexually assaulted.

{¶ 72} In Ohio, "an expert witness is permitted to testify about general information which allows the finder of fact to draw its own conclusion." *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 126 (7th Dist.), citing *State v. Buell*, 22 Ohio St.3d 124, 131, 489 N.E.2d 795 (1986) (allowing expert testimony concerning factors that might impair the accuracy of a typical eyewitness identification). Furthermore, in *State v. Stowers*, 81 Ohio St.3d 260, 262, 690 N.E.2d 881 (1998), the Ohio Supreme Court held that a properly qualified expert may testify about the general behavioral characteristics of child abuse victims. Therefore, even though Koskela never interviewed A.B. and did not have any specific knowledge of the facts of the case, the trial court did not err in permitting her to testify to the general characteristics of child abuse victims.

{¶ 73} Accordingly, appellant's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 74} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Ottawa County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.